John A. REED, Gerald G. Kaluzny, and RBK, Ltd., Plaintiffs-Appellants,

v.

VILLAGE OF SHOREWOOD, et al., Defendants-Appellees.

No. 82–2190.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1983.

Decided April 5, 1983.

Rehearing and Rehearing En Banc Denied July 7, 1983.

Timothy T. McLaughlin, Parker & McLaughlin, Chicago, Ill., for plaintiffs-appellants.

Gerald L. Maatman, Baker & McKenzie, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and NEAHER,* Senior District Judge.

POSNER, Circuit Judge.

This appeal from the dismissal on the defendants' motion for summary judgment of a suit for damages under 42 U.S.C. § 1983 requires us to consider questions under the First, Fourteenth, and Twenty-First Amendments, and also whether local legislators and judicial officers, and their municipal employer, have absolute immunity from such a suit.

The plaintiffs owned a bar in the Village of Shorewood, Illinois, and they allege that the defendants—a police officer, the police chief, and virtually the entire officialdom of the Village, as well as the Village itself—interfered with and eventually destroyed their business, in violation of the due process clause of the Fourteenth Amendment. According to the complaint as fleshed out by a factual summary in the plaintiffs'

memorandum opposing summary judgment, in 1976 the Village had issued the plaintiffs a Class A liquor license, which allowed them to offer live entertainment along with liquor, and although the license was for only one year it was renewed for each of the three succeeding years. But in 1979 the defendants began to harass the plaintiffs—arresting customers and employees on baseless charges, demanding proof of age from customers who obviously were many years over the legal drinking age, and bringing groundless proceedings to take away their Class A license. Defendant Talaga, who was both mayor and local liquor control commissioner, first tried to destroy the plaintiffs' business by suspending their license for 30 days for alleged infractions of the Village's liquor control ordinance. On appeal to the Illinois Liquor Control Commission, the suspension was reduced to five days. But then, in a ten-minute meeting of the Village Board of Trustees (whose other members are also named as defendants), Talaga rammed through an ordinance reducing the number of Class A liquor licenses in the Village from four to three, and informed the plaintiffs that their license would not be renewed for 1980. The plaintiffs appealed to the Illinois Liquor Control Commission, which reversed, holding that they were entitled to a hearing before a decision was made not to renew their license and granting them a stay to enable them to continue operating under their expired 1979 license. No hearing was held on remand. Instead, Talaga revoked the plaintiffs' license on trumped-up charges. Again the Illinois Liquor Control Commission reversed. In 1981 the defendants again refused to renew the plaintiffs' license, again without a hearing, and were again reversed. Weary of the endless hassle, the plaintiffs tried to sell their business, but the defendants interfered with their selling efforts and eventually the plaintiffs had to shut down their bar and surrender their liquor license. The plaintiffs attribute the de-

* The Honorable Edward R. Neaher, Senior District Judge of the Eastern District of New York, sitting by designation.

fendants' animosity to the fact that the live entertainment in the bar was provided by a rock and roll band.

The district judge dismissed the complaint, but not because any of the plaintiffs' factual allegations was shown in pretrial discovery to be baseless. He held that since the defendants never did succeed in yanking the plaintiffs' license (except for the five-day suspension which went into effect after the plaintiffs had been accorded due process by the Illinois Liquor Control Commission, and a three-hour closing as to which the plaintiffs' right to a subsequent hearing gave them all the process that was due), there was no deprivation of plaintiffs' property, even if a liquor license is property (the defendants argue it is not). He also held that while the plaintiffs may have had a First Amendment right to play rock and roll music they had no constitutional right to sell liquor at the same time.

██ Since *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), judicial discussions of whether a license or other interest is property for purposes of the due process clause of the Fourteenth Amendment invariably begin by observing that the answer depends on state (or, where applicable, which it is not here, federal) law; and when this observation is juxtaposed with the statement in section 1 of the Illinois Liquor Control Act, Ill.Rev. Stat.1981, ch. 43, ¶ 119, that a liquor license "shall be purely a personal privilege ... and shall not constitute property," the conclusion may seem inescapable that these plaintiffs had no Fourteenth Amendment property right in their liquor license. But it is not, even if one takes literally the proposition that property, unlike life and liberty, comes from government.

██ "Property" in the Illinois Liquor Control Act need not mean the same thing as "property" in the due process clause. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the companion case to *Roth,* held that a teacher's tenure contract creates a species of property, though it would not be so described under state law. And the rights of welfare recipi-

ents, though also not property in the conventional sense, were held in *Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1016–1017, 25 L.Ed.2d 287 (1970), to be property for purposes of the due process clause. Liquor licenses in Illinois cannot be sold or bequeathed and are limited in other ways that deprive them of some of the conventional attributes of property, but this does not mean they are not property in a due process clause sense. The statement that a liquor license is not property may have been intended just to emphasize these limitations, which appear in section 1 of the Liquor Control Act right after the statement.

██ So we must look behind labels, cf. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 448 (2d Cir.1980); *Winkler v. County of De Kalb,* 648 F.2d 411, 414 (5th Cir.1981), and decide whether the plaintiffs' license was "property" in a functional sense. Since, viewed functionally, property is what is securely and durably yours under state (or as in *Goldberg* federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain, we must ask whether under Illinois law a liquor license is securely and durably the licensee's. The license is good for one year and during that time, clearly, it is securely held, for it can be revoked only for cause, after notice and hearing, and subject to judicial review. See Ill.Rev.Stat.1981, ch. 43, ¶¶ 149, 153. These are the same conditions under which a teacher's tenure, a form of property under the Fourteenth Amendment, can be revoked.

██ Although the Liquor Control Act does not prescribe equivalent protections for nonrenewal, it does provide (again in section 1) that "any licensee may renew his license at the expiration thereof, provided he is then qualified to receive a license and the premises for which such renewal license is sought are suitable for such purposes...." These criteria for renewal are undemanding, which suggests that the Illinois legislature expected most licenses to be

renewed as a matter of course. From here it is only a step to equating nonrenewal with revocation and requiring the same safeguards against arbitrary nonrenewal as the statute expressly provides against arbitrary revocation. That step was taken in *City of Wyoming v. Liquor Control Comm'n of Illinois,* 48 Ill.App.3d 404, 409, 6 Ill.Dec. 258, 262, 362 N.E.2d 1080, 1084 (1977): "it could not have been the legislative intent that a local liquor control commissioner be able to easily avoid the application of the statutory procedural requirements to license revocation by waiting for the license to expire and then refuse to issue a renewal license. For that reason, we interpret the term 'revocation' [in section 5 of the Liquor Control Act] to include the refusal to issue a renewal license." The plaintiffs allege that the defendants "wait[ed] for the license to expire and then refuse[d] to issue a renewal license," and if true this entitled them under *City of Wyoming* to all the protections, procedural and substantive, of the revocation process, thus making their interest in renewal a property right for purposes of the Fourteenth Amendment. Cf. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 1–12, 98 S.Ct. 1554, 1554–1561, 56 L.Ed.2d 30 (1978).

This is so even though section 1 provides that renewal is not a "vested right" but a "privilege" that shall not prevent the local liquor control commissioner "from decreasing the number of licenses to be issued ...." If the number is reduced just to eliminate a particular licensee, which is what the plaintiffs allege was done here, the principle of *City of Wyoming*—that you may not do indirectly by nonrenewal what you could not do directly by revocation—comes into play. Otherwise *City of Wyoming* would be a dead letter.

We must consider next whether the defendants could be found to have *deprived* the plaintiffs of their property rights. The defendants never succeeded in taking away the plaintiffs' license either by revocation or nonrenewal; their efforts to do so were thwarted by the Illinois Liquor Control Commission; and though the brief

suspensions were deprivations, see *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975), they were not denials of due process. But "deprive" in the due process clause cannot just mean "destroy." If the state prevents you from entering your house it deprives you of your property right even if the fee simple remains securely yours. A property right is not bare title, but the right of exclusive use and enjoyment. So if it is true as alleged that through harassment of customers and employees and relentless, baseless prosecutions the defendants destroyed the value of the plaintiffs' licensed business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked.

The principle is familiar from the related area of takings of property that are subject to the just compensation clause of the Fifth Amendment. If government makes your house uninhabitable, that is a taking of your property even if you retain a clear title. *Barbian v. Panagis,* 694 F.2d 476, 483–85 (7th Cir.1982). The principle applies equally to deprivations as distinct from takings (permissible if compensated) of property, see *Wells Fargo Armored Serv. Corp. v. Georgia Pub. Serv. Comm'n,* 547 F.2d 938, 941 (5th Cir.1977)—and must, or state officials could with impunity destroy property rights in detail. *Reichenberger v. Pritchard,* 660 F.2d 280 (7th Cir.1981), is distinguishable. "[N]either the plaintiffs' expressive nor business activities have been interrupted," and "the terms of the complaint do not demonstrate how the plaintiffs have incurred additional legal expenses by dint of defendants' efforts," which were limited to intervening in license renewal proceedings to oppose the plaintiffs' application. *Id.* at 285.

The First Amendment claim in this case is separate from the plaintiffs' claim to have been deprived of property. Freedom of speech is one of the liberties the due process clause has been held to protect. Although the authors of the First Amend-

ment were concerned with protecting political rather than cultural expression, see, e.g., Chafee, Free Speech in the United States 7–33 (1948), and therefore might not have thought it a violation of the First Amendment for Congress to pass a law forbidding the playing of Haydn's string quartets on federal government lands, the modern view is different. If the defendants passed an ordinance forbidding the playing of rock and roll music in the Village of Shorewood, they would be infringing a First Amendment right, *Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060, 1063 (1st Cir.1980), rev'd on other grounds, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), even if the music had no political message—even if it had no words—and the defendants would have to produce a strong justification for thus repressing a form of "speech."

The defendants did not go that far; the allegation is that they suppressed the playing of rock and roll music in one bar. Whether or not they did this to deter the other bar owners in the Village from playing rock and roll, they were restricting "free speech," just as they would have been doing if they had tried to prevent the plaintiffs from playing rock and roll music softly in a private home. Since freedom of speech is not absolute, the defendants might be able to justify the restriction in this case— might be able to show that liquor and rock and roll music are an explosive mixture. Cf. *Grand Faloon Tavern, Inc. v. Wicker*, 670 F.2d 943, 951 (11th Cir.1982). In fact there is uncontested evidence of frequent disturbances at the plaintiffs' bar. But the defendants have not tried to show that rock and roll music should not be allowed in the plaintiffs' or any other bar in the Village of Shorewood. They stand on their denial that they wanted to suppress it, but we must assume the contrary as did the district court, so that on the record before us the defendants' alleged antipathy to the playing of rock and roll music at the plaintiffs' bar stands unmotivated and unreasonable.

The defendants argue, however, that in any event the Twenty-First Amendment, which repealed Prohibition but authorized each state to keep liquor out of the state if it wanted to, also repealed the First Amendment in bars and therefore allows the defendants to limit live entertainment by their Class A licensees for bad reasons or no reasons. They cite *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), where the Supreme Court relied in part on the Twenty-First Amendment in upholding a state regulation prohibiting certain types of sexually explicit entertainment in bars and nightclubs—entertainment that while extremely vulgar, to say the least, might in other settings have been protected by the First Amendment. The Court referred to "the added presumption in favor of the validity of the state regulation in this area that the Twenty-First Amendment requires." *Id.* at 118–19, 93 S.Ct. at 397. (The plaintiffs make no argument, as in *Grand Faloon Tavern, supra,* 670 F.2d at 944 n. 1, that the defendants have not been delegated the state's powers under the Twenty-First Amendment.)

An even better case for the defendants, though they do not cite it, is *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) (per curiam), which states not only that "whatever artistic or communicative value may attach to topless dancing is overcome by the State's exercise of its broad powers arising under the Twenty-First Amendment," *id.* at 718, 101 S.Ct. at 2601, but also that "the State's power to ban the sale of alcoholic beverages entirely includes the lesser power to ban the sale of liquor on premises where topless dancing occurs," *id.* at 717, 101 S.Ct. at 2601. Justice Stevens, dissenting, read the second quoted passage to imply that "a State may ban any protected activity on such premises, no matter how innocuous or, more importantly, how clearly protected." *Id.* at 719, 101 S.Ct. at 2602. If this is a correct reading of the majority opinion, the plaintiffs in this case have no First Amendment claim. But we do not read the opinion so broadly. More than the single sentence quoted by Justice Stevens would be necessary to persuade us that the Supreme Court would allow the defendants

to yank a liquor license because the licensee allowed the reading of the *New York Times* in his bar. *LaRue* and *Bellanca* make it easier—maybe much easier—than it would otherwise be for the states to justify restrictions on entertainment in places where liquor is served. But there must be *some* effort at justification; there was some even in *Bellanca,* where the Court quoted a statement from the legislative history of the challenged statute that "common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior." 452 U.S. at 718, 101 S.Ct. at 2601. There was none here, the defendants having staked their all on denying that they are opposed to their Class A licensees' playing rock and roll.

True, the plaintiffs were free to play rock and roll if they stopped operating their establishment as a bar. But this just means that a law or other official action which limits freedom of expression in some but not all circumstances is less vulnerable than a more restrictive action—that it is easier to justify banning rock and roll music in bars in the Village of Shorewood than it would be to justify banning it everywhere within the Village limits. There still had to be some justification for the lesser restriction unless it is *de minimis,* which we do not think banning a particular type of music in establishments that serve liquor is; and no justification has been offered here.

Thus there are genuine issues of material fact concerning the alleged violations of the plaintiffs' constitutional rights. But we must also consider the argument that some of the individual defendants—Talaga and the other members of the Village's board of trustees—are absolutely immune from damages liability for those violations. (The district judge initially so held but later withdrew his opinion on this point when he decided that an alternative ground for dismissal was that there had been no deprivation of property or liberty.) The argument is that Talaga—who is at once mayor, president of the Village's board of trustees, and local liquor control commissioner—has absolute immunity in the exercise of his judicial responsibilities as liquor control commissioner and of his legislative responsibilities as president of the board of trustees, and that all the trustees have absolute immunity in the exercise of their legislative responsibilities.

Although the defendants appear to believe that answering the immunity questions in favor of Talaga and the other trustees would support the district court's dismissal of the complaint in its entirety, it would not. Not only are there other defendants, who do not and could not claim absolute immunity as judicial or legislative officers, but the complaint about Talaga extends beyond his conduct as local liquor control commissioner and president of the board of trustees to his nonjudicial, nonlegislative conduct as mayor of Shorewood. Nevertheless, the absolute-immunity doctrine might justify partial summary judgment.

Judges of course have absolute immunity from damage suits based on their judicial rulings; the question we must decide here is whether a local liquor control commissioner in Illinois is acting in a judicial capacity when passing on renewal and revocation questions and if so whether it makes a difference that he is a local rather than state officer. It is clear from Ill.Rev. Stat.1981, ch. 43, ¶ 149, that the commissioner is acting in a judicial capacity when he revokes a liquor license. He may not revoke without finding that the licensee has violated the law; he may make that finding only after notice and hearing; and he "shall reduce all evidence to writing and shall maintain an official record of the proceedings." In addition, revocation is, as the parties to this case well know, appealable to the state Liquor Control Commission under Ill.Rev.Stat.1981, ch. 43, ¶ 153; and although the standard of review is various, in some cases it is just a substantial-evidence standard, which implies that the local commissioner is a type of first-line adjudicator, like a trial judge or his counterpart in administrative law. It is also clear that a local liquor control commissioner has the power to issue and renew—and therefore in

appropriate cases not to renew—local liquor licenses such as these plaintiffs' Class A license. See Ill.Rev.Stat.1981, ch. 43, ¶¶ 109, 110, 113–14, 120. It is unimportant that the statute does not prescribe the procedures for him to follow in renewal proceedings, since as we have already noted Illinois case law requires the same procedures for selective nonrenewal as for revocation. *Mary v. Ramsden,* 635 F.2d 590, 594, 600 (7th Cir.1980), which held (though with little discussion of the point) that the chairman of the disciplinary committee of an institution for juvenile delinquents was not entitled to absolute judicial immunity, gives us only brief pause. Although the committee granted the plaintiffs a hearing at which the issues were whether they had violated the institution rules and what sanction should be imposed, the committee's procedures were a good deal more informal than the ones here.

The fact that a local liquor control commissioner is not a regular judge in a court of general jurisdiction can make no difference after *Butz v. Economou,* 438 U.S. 478, 513–14, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978), which held that federal administrative law judges are entitled to absolute immunity because of the similarity of their functions to those of trial judges. See also *United States ex rel. Powell v. Irving,* 684 F.2d 494 (7th Cir.1982), holding that members of state parole boards have absolute immunity. It is true that the Supreme Court in *Butz* stressed that the Administrative Procedure Act protects the independence of administrative law judges and thereby reduces "the risk of an unconstitutional act by one presiding at an agency hearing," 438 U.S. at 514, 98 S.Ct. at 2914, and there is no suggestion of such protection here. But *Ashbrook v. Hoffman,* 617 F.2d 474, 476–77 (7th Cir.1980), decided after *Butz,* held that Indiana's partition commissioners, who have functions in relation to partition sales of real estate analogous to those of Illinois local liquor control commissioners in relation to liquor licenses, were absolutely immune from damage liability even though as in the present case there was no suggestion that their independence

was hedged about by safeguards like those provided by the Administrative Procedure Act. The basis of the absolute immunity of judges is less that they are unlikely to commit wrongs than that their wrongs are largely remediable through the appellate process and that forcing judges to defend their judicial rulings by standing trial on the complaint of a disappointed litigant would make it difficult for them to carry out their judicial duties and for society to recruit competent judges.

For this reason, it should also make no difference that Talaga is a local rather than state judicial officer. The decision that established the absolute immunity of judges from suits for damages under 42 U.S.C. § 1983, *Pierson v. Ray,* 386 U.S. 547, 549, 87 S.Ct. 1213, 1215, 18 L.Ed.2d 288 (1967), implies that it makes no difference, since the case involved a "municipal police justice." Many court of appeals decisions have since upheld the absolute immunity of local judges. See, e.g., *O'Neil v. City of Lake Oswego,* 642 F.2d 367, 368 n. 2 (9th Cir. 1981); *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974); *People of State of Mississippi ex rel. Giles v. Thomas,* 464 F.2d 156, 159–60 (5th Cir.1972) (per curiam).

The next question is whether Talaga and the other trustees are entitled to absolute immunity for their legislative action in reducing the number of Class A liquor licenses in Shorewood from four to three. Although the Supreme Court reserved decision on the question in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 404 n. 26, 99 S.Ct. 1171, 1178 n. 26, 59 L.Ed.2d 401 (1979), many recent court of appeals cases uphold the absolute immunity of local legislators. See *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 613–14 (8th Cir.1980); *Bruce v. Riddle,* 631 F.2d 272, 279 (4th Cir.1980); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1192–93 (5th Cir.1981); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1350 (9th Cir.1982). We think these decisions are correct, even though it can be argued that the safeguards against arbitrary action are fewer at the local than at the state or

federal level. At the higher levels of government the separation of powers, bureaucratic resistance to elected officials, the competition of parties and candidates, and an alert press combine to prevent elected officials from conspiring against individual citizens; and these forces may be attenuated at the local level. But the argument has carried no weight in the case of judges, as we have just seen, and in any event against it must be set the fact that local government is less powerful than state or federal government—which is no doubt why the safeguards are fewer. The statement in *Progress Development Corp. v. Mitchell,* 286 F.2d 222, 231 (7th Cir.1961), that "the common law immunity of state legislators for their acts . . . does not extend to local officials charged with administering in a *discriminatory* manner the laws so as to preclude Negroes from moving into an all-white community" (emphasis in original) could but does not have to be read to mean that local officials are entitled only to qualified immunity from damage suits based on their legislative acts; and *McLaughlin v. Tilendis,* 398 F.2d 287, 290 (7th Cir.1968), which cites *Progress Development Corp. v. Mitchell,* did not involve legislative acts.

We have last to consider the liability of the Village of Shorewood itself. The Supreme Court's refusal, in a much criticized (see, e.g., Comment, *Section 1983 Municipal Liability and the Doctrine of Respondeat Superior,* 46 U.Chi.L.Rev. 935 (1979)) but authoritative dictum in *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978), to apply the principle of respondeat superior in section 1983 cases requires us to determine whether "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" of which the plaintiffs in this case are complaining. *Id.* at 694, 98 S.Ct. at 2037. If so, the Village of Shorewood would not be immune.

"At some level of authority, there must be an official whose acts reflect governmental policy, for the government necessarily acts through its agents. Thus the question becomes one of identifying the official who has authority to make policy; then municipal liability attaches to acts performed pursuant to that policy." *Bowen v. Watkins,* 669 F.2d 979, 989 (5th Cir.1982). The plaintiffs contend that interference with their business was a policy orchestrated at the highest level of government in the Village of Shorewood. If so—a matter to be explored by the district court on remand—the Village would be liable. The official acts of municipal policy makers are acts of the municipality for purposes of section 1983 liability. See *Schneider v. City of Atlanta,* 628 F.2d 915, 920 (5th Cir.1980); *Black v. Stephens,* 662 F.2d 181, 191 (3d Cir.1981). And the municipality's liability for such acts extends to acts for which the policy-making officials themselves might enjoy absolute immunity because the acts were legislative or judicial in character. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), so held with regard to the qualified immunity of municipal officers for their executive acts, and we cannot see why there should be a different result here just because these officers' immunity is absolute rather than qualified. The rationale of *Owen,* that holding the municipality liable creates incentives to avoid illegal behavior without at the same time overdeterring individuals by the threat of crushing personal liability, 445 U.S. at 655–57, 100 S.Ct. at 1417–18, applies with as much force to legislative and judicial as to executive officers.

*Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), which holds that persons who conspire with a judge in violation of section 1983 cannot claim the judge's absolute immunity from suit, supports this reading of *Owen.* "In terms of undermining a judge's independence and his judicial performance, the concern that his conduct will be examined in a collateral proceeding . . . in which he cannot be held liable for damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant

954

in a damages action ...." 449 U.S. at 31, 101 S.Ct. at 188. An action against the municipality is just such a "collateral proceeding."

To summarize, we reverse the district court's dismissal of the complaint except with regard to the legislative acts of the defendant trustees and the judicial and legislative acts of defendant Talaga. But this is not to say that the case must necessarily go to trial. There may be other grounds for summary judgment not considered by the district court or by us; if so, the district court can consider them on remand.

The district court's decision dismissing the complaint is affirmed in part and reversed in part, the case is remanded for further proceedings consistent with this opinion, and costs in this court are awarded to the appellants.

SO ORDERED.