Jeffrey L. ANDREE and Carol E. Andree, Plaintiffs-Appellants,

v.

ASHLAND COUNTY, a body politic of the State of Wisconsin; Donald W. Wilmot; David Enblom; Harlan Miller; John Felix; and Dennis Delegan, Defendants-Appellees.

Nos. 85–3054, 85–3189.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1986.

Decided May 5, 1987.

Daniel F. Snyder, DeBardeleben & Snyder, Park Falls, Wis., for defendants-appellees.

Steven J. Schooler, Brynelson, Herrick, Buciada, Dorschel & Armstrong, Madison, Wis., for plaintiffs-appellants.

Before CUMMINGS and RIPPLE, . Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is an appeal from the grant of summary judgment in favor of the defendants on plaintiffs' claim under 42 U.S.C. § 1983 (1982). Because we find that the district judge correctly concluded that there existed no genuine issue of material fact and that the defendants were entitled to judgment as a matter of law, we affirm.

## I.

Plaintiffs are the owners of a resort in Ashland County, Wisconsin, known as the "Idlewild." The Idlewild has been a place

of musical entertainment since the early part of this century. As a part of the resort, plaintiffs operate a dance hall and serve alcoholic beverages. Defendants are Ashland County; Donald Wilmot, its Sheriff; David Enblom, its Undersheriff; and Harlan Miller, John Felix, and Dennis Delegan, three of its deputies. The events giving rise to this suit stem from plaintiffs' efforts to promote an outdoor music festival at the Idlewild in August of 1981, and the defendants' response.

Ashland County (the "County") had in force at that time an ordinance providing for the licensing of assemblies of more than 250 people. Pursuant to the ordinance, the promoter of such an assembly was required to provide certain sanitary and emergency facilities, and post a cash bond.[1] In order to obtain a permit to hold an assembly covered by the ordinance, the promoter had to submit an application detailing compliance with the ordinance at least thirty days prior to a regularly scheduled meeting of the county Board of Supervisors (the "Board"). During the period in question, the Board met three times a year—in April, September, and November. Under the ordinance, the Board was given no discretion to deny a permit, provided that the requirements of the ordinance were met. The ordinance purported to be enforceable by injunction.

In August of 1981, the defendant sheriff learned that the plaintiffs were planning an outdoor rock festival and that they expected 2000 to 4000 people to attend. He discovered that they had not applied for a permit under the ordinance and directed one of his deputies (a non-party to this suit) to deliver a copy of the ordinance to plaintiffs. In addition, he requested that same deputy to determine whether the plaintiffs had obtained a proper extension of their liquor license to allow them to serve alcohol on the concert grounds; they had. The plaintiffs told the deputy that they did not intend to comply with the ordinance, because it was "not worth the paper it was written on." The sheriff then consulted with the county attorney, who decided to file an action seeking to enjoin the rock festival. Injunctive relief was denied by a Wisconsin state court on the ground that, under Wisconsin law, a municipal ordinance may not be enforced by way of injunction unless the activity to be enjoined constitutes a nuisance *per se*, which the rock festival did not. Thus, the state court found it unnecessary to address the contention that the ordinance was invalid because it violated the First Amendment of the United States Constitution.

Following the failed injunction attempt, the sheriff again consulted with the county attorney. He decided to send the defendant undersheriff Enblom and three deputies to the festival, "to observe the crowd, observe what is going on, make sure that everything was peaceable and not to take any enforcement action unless there was a crime committed and to offer any assistance that we could to the large gathering." The deputies were also told to check for violations of the liquor laws.[2] They were

---

**1.** Among other things, the ordinance required the promoter of a large assembly to provide one gallon per person per day of drinking water; ten gallons per person per day of bathing water; one toilet for every two hundred females and one toilet for every three hundred males; solid waste disposal sufficient to dispose of 2.5 pounds of solid waste per person per day; one nurse for every fifteen hundred people and one physician for every one thousand people; one telephone for every one thousand people; one security guard for every one hundred people; one free parking space for every four people; fire protection as set forth in the *Wisconsin Administrative Code;* and a fence surrounding the entire area of the assembly with at least four gates, one at each point of the compass. In addition, the promoter was required by the

terms of the ordinance to post a cash bond in the amount of $5.00 for each person expected to attend, and to take all reasonably necessary precautions to insure that the sound of the assembly would not carry unreasonably beyond the enclosed boundaries of the assembly area.

**2.** Plaintiffs claim that a genuine issue of material fact exists regarding whether one of the purposes of sending the deputies to the Idlewild was to check for liquor law violations. However, it is undisputed that the deputies visually surveyed the crowd to see if any minors appeared to be drinking alcoholic beverages. Furthermore, the sheriff had previously checked to see whether plaintiffs had obtained the necessary extension of their liquor license to serve alcoholic beverages near the outdoor concert

told to wear a "full dress uniform," which apparently meant that they were to be equipped with riot batons.[3]

Upon their arrival, the deputies were told that their presence was unwanted, and that no one was allowed in unless they paid the admission fee. However, the deputies entered the grounds over plaintiffs' objections.[4] Once inside, they patrolled for a short time and then left. However, their conduct at the concert is the subject of some debate. According to the deputies, they did not verbally or physically threaten anyone. Plaintiffs, on the other hand, contend that the officers harassed and intimidated concert patrons. Plaintiffs rely on the affidavit of one Daniel Dassow, who stated that:

.... As the group of three or four deputy sheriffs walked through the crowd in attendance at the concert, some of the said deputy sheriffs carried their billy clubs in their hands. The affiant saw the deputy sheriffs approach various concert patrons and groups of concert patrons and engage such concert patrons in discussions.

The arrival of the marked squad cars upon the concert grounds, the number of deputy sheriffs present, the appearance of the deputy sheriffs in full uniforms with guns and billy clubs, the conduct of said deputy sheriffs in walking in force through the assembled crowd, and the unsolicited approach of said deputy sheriffs to concert patrons and groups of concert patrons were done in such a manner as to intimidate the affiant and the other persons in the group of which the affiant was a member....

By reason of the intimidation caused by the presence, appearance, and activities of said deputy sheriffs, as described above, and for that reason only, the affiant and each of the other persons comprising the group of which the affiant was a member, left the concert grounds approximately 5 or 10 minutes after the arrival of said deputy sheriffs and never returned.

R. 82 at 2.

Additionally, both the plaintiffs testified in their depositions that numerous concert patrons left shortly after the arrival of the deputies and expressed their feelings of intimidation as the reason for their leaving. The plaintiffs refunded the money of the concert patrons who left. Although both of the plaintiffs denied seeing any of the deputies swing or brandish the batons at any concert patrons, or seeing the deputies remove the batons from their holsters while patrolling through the crowd, both swore out a set of interrogatory responses which stated that the deputies "patroll[ed] in a menacing manner among the patrons of plaintiffs' music concert on plaintiffs' premises while in uniform and conspicuously [bore] firearms and clubs [and] wield[ed] clubs in a threatening manner while patrolling among the patrons of plaintiffs' music concert on plaintiffs' premises." Additionally, plaintiff Jeffrey Andree testified he casually remarked to undersheriff Enblom, "See, we aren't so bad here in Butternut" and was greeted with a threatening reply "We are not through with you yet."

Plaintiffs contended that, as a result of the unfavorable publicity generated by the attempt to secure the injunction, the crowd

___

ground. Both the sheriff and undersheriff Enblom stated in their affidavits that the sheriff instructed Enblom to enforce the liquor laws. In light of the foregoing, we agree with the district court that the failure of the sheriff to specifically mention enforcement of the liquor laws in his deposition does not raise a reasonable inference that either the affidavits or Enblom's deposition testimony on this point was fabricated.

3. The equipment that the deputies were instructed to carry has been the subject of a considerable semantic duel throughout this litigation. Specifically, the defendants all but refuse to

attach a name to the batons (although Undersheriff Enblom for some reason thought the term "night stick" acceptable, but not the term "billy club"), generally referring only to the rather undescriptive euphemism "full dress uniform." Plaintiffs, on the other hand, have referred to the batons as "billy clubs" or "twenty-six-inch oak clubs." Regardless of the terminology, the facts are undisputed that the deputies were equipped with batons on the day of the festival.

4. Defendants contend that they were waved in by an unidentified individual who was manning the gate.

that attended the festival was only 100 to 350 rather than the expected 2000 to 4000. Additionally, plaintiffs claimed damages for the refunds they gave to patrons who left as a result of the deputies' intimidating manner, and for a general loss in subsequent business which they attribute to the actions of the defendants. Finally, the plaintiffs sought $400,000 in punitive damages, a declaration that the ordinance was unconstitutional, and an injunction against its enforcement. The primary thrust of plaintiffs' claims was that the ordinance, the injunction suit, and the actions of the deputies violated plaintiffs' First Amendment rights. Additionally, however, they asserted that they were deprived of their rights under the Fourth, Fifth, and Fourteenth Amendments.

The district court granted the defendants' motions for summary judgment on plaintiffs' claims for damages arising from the attempt to secure the injunction and the police conduct on the day of the concert, but denied defendant Ashland County's summary judgment motion regarding the constitutionality of the ordinance under the First Amendment. Subsequently, the County rescinded the ordinance, and the district court entered judgment for the County on the remaining claims, apparently viewing them to be moot.

█ On appeal, the plaintiffs challenge the disposition of their First Amendment claims regarding the injunction proceedings and their First and Fourth Amendment claims regarding the conduct of the deputies the day of the concert.[5]

## II.

We turn first to the claim that bringing the injunction action constituted a deprivation of plaintiffs' First Amendment rights in violation of 42 U.S.C. § 1983. We agree with the district court that the state lawsuit did not constitute such a deprivation.[6] This conclusion is suggested, if not compelled, by this court's holdings in *Reichenberger v. Pritchard*, 660 F.2d 280 (7th Cir. 1981) and *Goldschmidt v. Patchett*, 686 F.2d 582 (7th Cir.1982).

In *Reichenberger*, a private citizen and a county official conspired together to suppress non-obscene nude dancing at a local nightclub. In furtherance of their plan, they attempted to participate in three separate municipal administrative proceedings

---

5. The original judgment, disposing of fewer than all the claims and parties, was certified by the district court under Fed.R.Civ.P. 54(b), and was timely appealed by plaintiffs. When the district court subsequently entered judgment on the claim regarding the constitutionality of the ordinance, plaintiffs filed a separate notice of appeal. However, they present no argument in their brief that the district court's holding that this claim was moot was error. Accordingly, any error which may have existed is waived. *See Manbourne, Inc. v. Conrad,* 796 F.2d 884 (7th Cir.1986).

6. This particular claim appears to be brought only against Wilmot and the County. Wilmot claims entitlement to both qualified and absolute immunity. However, in view of our disposition of this case, we need not "concern ourselves with the vagaries of civil rights immunity." *Mazanec v. North Judson-San Pierre School Corp.,* 798 F.2d 230, 235 (7th Cir.1986). We note, however, that officials such as Wilmot are ordinarily entitled to qualified immunity. *Compare Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (officer who submitted probable cause affidavit in support of request for search warrant only entitled to qualified immunity) with *Briscoe v. LaHue,* 460 U.S.

325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (police officer who testified at criminal trial entitled to absolute immunity). As the cited cases indicate, it may well be that Wilmot is entitled to absolute immunity for some of his actions, but only qualified immunity for others. We need not decide the issue. Nor need we decide what circumstances, if any, would justify applying the district attorney's immunity under *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) to either the Sheriff or the County. *Cf. Cribb v. Pelham,* 552 F.Supp. 1217, 1226 (D.S.C.1982) (county absolutely immune from liability for prosecutor's decision to bring criminal charges, since contrary result would undermine policies of *Imbler* immunity).

We also note that, in reaching the merits of this claim, we have considered and found wanting defendants' arguments that it is essentially an "as applied" challenge to the ordinance. Plaintiffs contention, although ultimately unsupported, was that defendants knew or should have known that the ordinance was facially invalid, and thus independently deprived plaintiffs of their First Amendment rights by seeking an injunction. Thus, we do not believe that the failure of plaintiffs to apply for a license under the statute deprives them of their standing, or is otherwise relevant to this lawsuit.

in an effort to have the clubs' liquor licenses revoked or to make the cost of renewal prohibitively expensive. The conspirators failed to prevent the renewal of the licenses, although the club owners did incur substantial legal expenses in securing the renewals. This court, reviewing the dismissal of a complaint brought by the club owners, held:

> The complaint does not allege that the plaintiffs' expressive activity has been interrupted, and, indeed, the plaintiffs have conceded at oral argument that the nude dancing continues as ever at their two clubs. Nor have the plaintiffs been deprived of their liquor licenses. The allegations of the complaint are clear that despite the defendants' alleged interference, the plaintiffs' licenses have been renewed annually and the business of the two clubs continues. The legal fees expended by the plaintiffs in the administrative proceedings cannot qualify as a constitutional injury absent a showing of deprivation of a constitutional magnitude. The terms of the complaint do not demonstrate how the plaintiffs have incurred additional legal expenses by dint of defendants' efforts, since the plaintiffs were statutorily required to appear before [the licensing authorities] for license renewal in any event.... Furthermore, because citizen participation in such proceedings is safeguarded by the First Amendment right to petition, it is absolutely privileged from the type of attack these plaintiffs now seek to mount upon ...

660 F.2d at 285.

The court concluded that "the district court properly determined that the plaintiffs have suffered no injury or deprivation of constitutional rights as long as their expressive activity continues, they retain their liquor licenses, and continue in business." *Id.* at 287.

In *Goldschmidt*, the plaintiff was an attorney who had placed an advertisement in a local newspaper indicating that he would provide representation in divorce cases for a set fee. A local district attorney sent the plaintiff a letter informing him that the advertisement appeared to violate an Illinois Statute that prohibited advertising for dissolution of marriage. The plaintiff brought suit against both the district attorney and a number of "John Doe" defendants who were alleged to have conspired with him to deny the plaintiff's First Amendment rights. During the pendency of the suit, the statute was repealed, making claims for declaratory and injunctive relief moot—not unlike the situation in the present case. The court held that the district attorney was immune from suit, but addressed the claims against the John Doe defendants on the merits, noting that:

> Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises.... In *Reichenberger* ... we rejected the argument that Section 1983 reached an existing threat of deprivation of free speech. The prosecutor's action here can be characterized at most as a warning or a threat; the plaintiff continued his advertising.... Not even the possibility of future injury exists here because the offending statute has been repealed.

686 F.2d at 585 (citations omitted).

Although disagreeing with the immunity holding, Judge Swygert in concurrence agreed with the holding that a deprivation had not been alleged, noting that "plaintiff fail[ed] to allege any present injury flowing from the claimed First Amendment violation.... Apparently defendant's letter did not have any chilling effect on plaintiff because plaintiff continued to advertise his services." *Id.* at 582 n. 1 (Swygert, J., concurring.).

■ Taken together, those two cases make clear that the mere *attempt* to deprive a person of his First Amendment rights is not, under usual circumstances, actionable under section 1983. Nor are plaintiffs' attempts to distinguish the cases persuasive. As we have noted above, *Goldschmidt* was decided on the merits as to the John Doe defendants, not, as plaintiffs assert, on the ground of the prosecuting attorney's absolute immunity. And to assert, as plaintiffs do, that *Reichenberger*

was decided solely as a clash of the conflicting First Amendment rights of two groups of private citizens is to compress the holding in that case into but one of the supporting reasons on which the court relied.

■■■■ Plaintiffs' assertion that, unlike the case in *Reichenberger*, they suffered a concrete injury from the County's attempts to enforce its ordinance, is also unavailing. There is no competent evidence from which a reasonable inference may be drawn that the County's injunction suit resulted in reduced attendance at the concert. At most, plaintiffs have presented inadmissible hearsay that some persons did not attend because of remarks regarding the general dangers of such concerts, subsequently published in the local newspaper, that the judge and prosecuting attorney made at the injunction hearing.[7] No witness presented by plaintiffs was able to name a single prospective concert patron who did not attend because of the injunction attempt. The only additional injury to which plaintiffs can point is the cost incurred in defending the injunction action. Such costs, we hold, are not recoverable as a substantive item of damage[8] under section 1983 in the absence of some showing that the proceeding was brought for some ulterior purpose, i.e., that it was tantamount to a malicious prosecution or abuse of process.

This case is not, as plaintiffs contend, governed by this court's decision in *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir.1983). There the plaintiffs alleged that the defendants had brought a series of baseless proceedings against plaintiffs' liquor license, in an attempt to suppress rock and roll music played at their bar. The superficial similarity is belied by the fact that the defendants in *Reed* sought to obtain the collateral objective of preventing plaintiffs' expressive activities through a series of baseless and, purportedly, unrelated proceedings. Ultimately, the plaintiffs in *Reed* were forced to give up their liquor license and shut down. Here, by contrast, the County has merely sought, once, to enforce what it believed was a valid ordinance. The attempt failed—without any determination that the ordinance was constitutionally invalid—and the concert went forward, as have concerts in the years since.

*Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060 (1st Cir.1980); *vacated on other grounds*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), upon which plaintiffs rely, is also distinguishable. There a city council had expressly attempted to cancel a concert because of the appearance on the program of a particular group. A more blatant example of content-based discrimination is scarcely imaginable. Here, on the other hand, the ordinance was facially content-neutral. In any event, to the extent that *Fact Concerts* suggests that a single attempt to enforce an ordinance that may turn out to be unconstitutional is a deprivation under section 1983, it is inconsistent with our own holdings in *Reichenberger* and *Goldschmidt*.

■■■■ There are important reasons for holding, as we do today, that the mere unsuccessful attempt to secure an injunction under an allegedly unconstitutional ordinance does not itself make out a deprivation of constitutional rights. We believe that a contrary holding would be basically inconsistent with our system of constitutional adjudication. The defensive assertion of constitutional claims plays an important part in that system, and we do not believe that a state should have to forego enforcement of its statutes and ordinances on the chance that they might later be determined unconstitutional. Thus, we de-

---

7. The prosecutor referred to then recent events in which concert patrons had been killed or injured. In denying the injunction, the state court judge expressed the hope that "nothing happens" at the concert, apparently expressing some sympathy for the County's concerns, but unable, under state law, to grant the County an injunction.

8. Because those costs were incurred in the state law injunction proceeding, there is no issue before this court regarding whether they could be recovered under the civil rights fee shifting statute, 42 U.S.C. § 1988.

cline to adopt a rule of construction under section 1983 that imposes liability for the attempted enforcement of state laws and municipal ordinances, which are presumptively constitutional, because they turn out, in hindsight, to have been unconstitutional. While our analysis might be different were the ordinance sought to be enforced plainly unconstitutional, or the enforcement action a pretext for the suppression of expressive activity because of its content, we do not believe those circumstances are present in this case.

As a general matter, state statutes and municipal ordinances are entitled to a presumption of constitutionality. Those against whom those rules operate may challenge their constitutionality in one of several ways. One is to seek, under proper circumstances, an injunction against their enforcement in a section 1983 action, although the availability of such relief may be limited by concerns of comity and federalism if, for example, a criminal prosecution under the statute or ordinance is pending. *See, e.g., Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[9] Another method is to seek a declaration that the statute or ordinance violates the Constitution, although problems of ripeness or standing may manifest themselves unless enforcement action is imminent. *See, e.g., Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *J.N.S., Inc. v. Indiana*, 712 F.2d 303 (7th Cir. 1983).[10] Again, such relief may be barred by *Younger* abstention if a prosecution is pending. *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *cf. Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaratory relief not barred when no state prosecution is pending). Finally, a party may interpose a constitutional defense to an enforcement action under the statute or ordinance, as plaintiffs sought to do here, although the state court ultimately found it unnecessary to rule on the constitutional issue. We do not believe that this third, and quite possibly most common, means of constitutional adjudication should entail an additional cost for the loser, here Ashland County, in the form of an action for damages against it under section 1983.

Additionally, were we to accept plaintiffs' theory of liability, we would once again squarely be presented with the question of the constitutionality of the ordinance. The state court denied the injunction on state law grounds, thus avoiding the need to decide whether the ordinance was unconstitutional. If the bare attempt to enforce the statute can itself be a deprivation of the right the ordinance was alleged to have abridged, then this exercise will have been for naught.

■ We note that we are not dealing with a case where the statute or ordinance is palpably unconstitutional. For, while the plaintiffs may well have ultimately been correct in their contention that the ordinance was invalid under the Constitution, a matter about which we express no opinion, it is not *obviously* so. On its face, it is content-neutral. And the regulations, while perhaps burdensome, relate only to the time, place, and, primarily, manner in which large assemblies are to be conducted. *Cf. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (prohibition on sleeping in certain areas under the control of the National Park service was reasonable time, place, manner regulation despite the fact that it effectively prevented round-the-clock demonstration to protest the plight of the homeless on Mall and in Lafayette Park in Washington, D.C.).

Nor are we dealing with a case where the enforcement action is brought merely to suppress the expressive conduct, regardless of compliance with the regulations. Plaintiffs are certainly correct that the purpose of the injunction action was to prevent

**9.** Plaintiffs did not seek such relief, apparently because they were unaware of the ordinance until shortly before the County's attempt to secure an injunction.

**10.** The parties do not appear to dispute that a declaratory action would have been appropriate had the ordinance not been rescinded. We of course express no opinion on what the appropriate outcome of such a suit would have been.

the concert *unless it complied with the ordinance,* but this in no way undermines the legitimacy of the county's attempts to enforce its laws. Plaintiffs point to nothing which would allow the inference that the defendants wanted to shut down the concert, regardless of compliance with the ordinance. The county was merely attempting to secure compliance with an ordinance that it considered constitutional.[11]

Thus we hold that, under the circumstances of this case, the unsuccessful attempt to enforce the ordinance was not itself a deprivation, within the meaning of section 1983, of plaintiffs' First Amendment rights.

### III.

■ We also reject the plaintiffs' claim that the presence of the deputies at the concert, over plaintiffs' objections, violated plaintiffs' rights under the Fourth Amendment. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). The determination whether a person has such an interest is "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)). It is doubtful whether plaintiffs have satisfied the first part of that inquiry, i.e., that they had a subjective expectation of priva-

cy. In any event, they failed the second, as any such expectation would have been plainly unreasonable. We conclude that plaintiffs retained no constitutionally protected expectation of privacy in the concert grounds for at least three reasons: (1) the general public was invited to the concert; (2) the concert was conducted in an open field; and (3) the deputies had a legal right to inspect the plaintiffs' premises because the premises were licensed for the sale of intoxicating beverages and the officers were present to enforce the laws governing the sale of such beverages.

■ Plaintiffs do not contest the fact that the general public was invited to attend the concert upon payment of the admission price. Plaintiffs' contention that the deputies' presence on their premises violated the Fourth Amendment appears to stem from the fact that the deputies entered the concert grounds without paying. Such a contention is utterly without merit. Those things that a person knowingly exposes to public view are not protected from official eyes by the Fourth Amendment. *See Ciraolo,* 106 S.Ct. at 1812; *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *Katz,* 389 U.S. at 353, 88 S.Ct. at 511. Had the deputies gone in plain clothes and paid the admission fee, there is little doubt that they would have been admitted. Under such circumstances, their presence and inspection of the premises clearly would not have violated the Fourth Amendment. *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (detective's presence in bookstore into which general public was invited to transact business did not violate Fourth Amendment). We do not think that the fact that the deputies

---

**11.** Plaintiffs have attempted to demonstrate that the defendants were motivated by animus against a particular form of expression, i.e., rock music. However, their complaint did not set forth any claim of selective prosecution. The district court properly excluded such a claim, made for the first time in plaintiffs' showing in opposition to summary judgment. Plaintiffs' complaint did not give fair warning of the theory. If it had, defendants may have been able to show, as they nonetheless attempted to do, that the events against which they did not

seek to enforce the ordinance, generally street fair type events which took place over several days, did not present the same concerns as plaintiffs' rock festival, independently of any supposed content-based discrimination. Nor does the fact that the county index listed the ordinance as "Rulles [sic] and Regs of Such Groups as Rock Festivals" aid plaintiffs. As the district court noted, the index is not part of the ordinance and was prepared by a clerical employee. In any event, the quoted language is merely illustrative.

insisted on entering the concert grounds over plaintiffs' protestations that they had to pay the admission fee make a constitutional difference. Even though such an entry may have been a trespass, that alone would not suffice to make out a constitutional violation. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984).

■ Secondly, the plaintiffs had no constitutionally protectible interest in the concert ground under the "open field" doctrine developed in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), as recently reaffirmed by the Supreme Court in *Oliver*. The fact that plaintiffs fenced off the concert ground, or that it was generally not open to public view, does not make any difference to the constitutional analysis. In *Oliver*, the Court held that the open field doctrine applied in spite of the fact that the fields in question could not be seen from any public point of access. *See id.*, 104 S.Ct. at 1738–39, 1743. *See also United States v. Dunn*, — U.S. —, 107 S.Ct. 1154, 94 L.Ed.2d 326 (1987) (Barn which was separated from house by 60 yards and was separately fenced was in an open field rather than curtilage although its interior could not be seen from any point of public access).

■ Finally, the deputies were authorized to inspect premises that were licensed to sell intoxicating beverages under Wis. Stat.Ann. § 139.08(4) (West Supp.1986). The Supreme Court has indicated that legislatively authorized inspections of businesses subject to longstanding and pervasive government regulation need not be conducted pursuant to a warrant. *See Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (mining); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor). Such searches must be pursuant to a statutory scheme which " 'in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant.' " *Serpas v. Schmidt*, 808 F.2d 601, 605 (7th Cir.1986)

(quoting *Dewey*, 452 U.S. at 603, 101 S.Ct. at 2540). Plaintiffs do not challenge the sufficiency of the Wisconsin statute under *Dewey*, and we do not consider the issue. Instead, they contend there is a genuine issue whether the deputies went to the Idlewild pursuant to that statute.

■ We agree with the district court that the defendants have established that there is no genuine issue with regard to this fact. As we noted above, all of the affidavits of the deputies listed enforcement of the liquor laws as one of the purposes of the visits, as did several of the depositions. The mere fact that this purpose was omitted in some of the depositions, when there was no question posed to which such an omission could reasonably be construed as a denial, does not create a genuine issue. The plaintiffs have simply failed to create a genuine issue in this regard.

Additionally, the fact that the deputies found it unnecessary to take any specific enforcement action does not lead to the conclusion that they were not there to enforce the liquor laws. The deputies who testified on the matter indicated that, upon surveying the crowd, they had no reason to believe that any underage drinking was taking place. Plaintiffs' apparent suggestion that the deputies should have asked patrons for identification if they were serious about enforcing the liquor laws is, under these circumstances, incredible. Had the deputies in fact asked for identification of patrons whom they clearly thought were over the legal age to drink, they might have committed the very type of harassment condemned in *Reed*. Furthermore, there was no need to check plaintiffs' liquor license, because its status had been investigated just a few days before. In sum, no reasonable person could infer that the deputies did not have, as one of their purposes when they entered the premises, the enforcement of the liquor laws.

## IV.

■ The final aspect of this claim, whether the presence or conduct of the

deputies on the concert grounds constituted a deprivation of appellants' First Amendment rights, was also correctly decided by the district court. While police harassment of concert patrons may, in some instances, be a violation of the First Amendment, *see* *P.A.B., Inc. v. Stack*, 440 F.Supp. 937 (S.D. Fla.1977) (open police surveillance of patrons of adult bookstore and suggestions that they should not enter the store); *Maguin v. Miller*, 433 F.Supp. 223 (D.Kan. 1977) (detention of patrons of adult theater until they divulged their names and other personal information); *Bee See Books, Inc. v. Leary*, 291 F.Supp. 622 (S.D.N.Y.1968) (police officer stationed on premises of adult bookstore during all hours it was open for several days running), we need not decide the issue in this case, since the record is quite plain that no such harassment occurred.

The deputies testified without contradiction that they did not threaten anyone either physically or verbally. None of plaintiffs' witnesses were able to identify so much as a single incident of a threat made to a concert patron.[12] The Dassow affidavit, upon which plaintiffs rely heavily, merely recites in conclusory fashion that the actions of the police officers were "done in such a manner as to intimidate the affiant and the other persons in the group of which the affiant was a member." Setting aside the competence of Dassow to testify to the feelings of intimidation of his companions, the affidavit demonstrates no more than that one group of concert patrons felt intimidated by the presence of the police officers. This is not enough. The police officers must have done something to reasonably justify those feelings of apprehension. As one of plaintiffs' own witnesses noted, many people simply do not like to have policemen around. Van Auken Dep. at 32–34. Such feelings do not trans-

form otherwise innocuous police conduct into harassment.

One potentially troublesome aspect of the Dassow affidavit is the statement that some of the deputies carried their riot batons in their hands. However, the manner in which they were carried is not further elucidated. Had they either been pointed or swung at concert patrons, that could have been easily stated. In the absence of a more definite statement that the batons were used to threaten concert patrons, we conclude that the affidavit does not raise a genuine issue of police intimidation.[13]

In the absence of police harassment, there was not, as a matter of law, a constitutional violation. We know of no authority for a holding that the mere presence of police officers at a place where they otherwise have a lawful right to be constitutes a violation of the First Amendment. Although plaintiffs contend that the cases cited above, particularly *Bee See Books*, support such a conclusion, we are unpersuaded. In those cases, the salient fact was the total absence of any legitimate justification for the police presence. Here, not only did the deputies have a legitimate right to be on the concert grounds to enforce the liquor laws, but they also were legitimately on the grounds to perform crowd control, if necessary. The fact that the gathering took place on private property does not negate the state's interest in ensuring that it remained peaceable. According to plaintiffs, some 2000 to 4000 people were expected. The county's apprehension that such a large gathering presented a unique potential for trouble can hardly be deemed unreasonable.

Additionally, the police conduct in those cases was both affirmatively harassing, e.g., requesting employees and patrons for identification and writing down license numbers of cars parked on the premises,

---

12. We agree with the district court that Enblom's single remark "We are not through with you yet" is insufficient, as a matter of law, to rise to the level of unconstitutional harassment.

13. In their answers to interrogatories, the plaintiffs describe the deputies as "wielding" the batons. However, at their depositions, both plaintiffs denied having seen any of the deputies remove the batons from their belts. We must conclude that the interrogatory answers were not based on personal knowledge, in which case they were inadmissible to defeat defendants' summary judgment motions. We note that the interrogatories were answered on "information and belief."

and continued over a significant period of time. One of the courts aptly described the police behavior as a "clear and continuous pattern of harassment." *P.A.B., Inc.,* 440 F.Supp. at 944–45. Even viewing the evidence in a light most favorable to the plaintiffs, as we must, the plaintiffs have failed to show the existence of a genuine issue regarding police misconduct.

In sum, we find that the defendants have demonstrated that there is no genuine issue with regard to harassment, and plaintiffs have not made any sufficient showing to rebut this. Furthermore, we find that, under the facts of this case, the mere presence of police officers at the concert, where they had a lawful right to be, did not constitute a First Amendment violation.[14]

## V.

For the reasons stated above, the decision of the district court is

AFFIRMED.

**14.** Appellees have requested that we assess attorney's fees under 28 U.S.C. § 1927 and Fed.R. Civ.P. 11. The basis for this request seems to be appellees' belief that the action itself was frivolous, not that this appeal is frivolous for any independent reason. As such, we deny appellees' request without prejudice to their renewal of this issue in the district court, which already has before it a motion for attorney's fees under 42 U.S.C. § 1988.