File Name: 09a0127n.06
Filed: February 12, 2009
NOT RECOMMENDED FOR PUBLICATION

No. 07-4477

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


DESALEGN SISAY, ET AL.,

     Plaintiffs-Appellees,

v.

RICKY D. SMITH, ET AL.,

     Defendants-Appellants.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

_____/

BEFORE:    CLAY and GRIFFIN, Circuit Judges; and STAFFORD, District Judge.[*]

     STAFFORD, District Judge.

The plaintiffs are four taxicab companies and the five individuals who own those companies. All four companies operate in the City of Cleveland (the "City"). In this action, the plaintiffs challenge a determination by the City to award to other cab companies the exclusive right to use the outbound queue at the Cleveland Hopkins

_____

[*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

-1-

International Airport ("Hopkins").  The district court granted a preliminary injunction in favor of the plaintiffs, enjoining the City from interfering with the plaintiffs' right to use the outbound queue at Hopkins.  The City appeals from the district court's preliminary injunction order.  Because the plaintiffs have not demonstrated that they are likely to succeed on the merits of their lawsuit, we **REVERSE**.

## BACKGROUND

Each of the individual plaintiffs is a first-generation immigrant whose cab company provides outbound service from Hopkins.  Desalegn Sisay, an immigrant from Ethiopia, is the owner and president of ABC Taxi.  As of September 2006, ABC Taxi had been in business for three years, dispatched 33 or 34 cabs, and generated less than one million dollars a year in gross revenue.  Kashmir Sing, an immigrant from India, is the owner of Airport Taxi.  As of  September 2006, Airport Taxi had been in business for less than seven years, dispatched less than 50 cabs, and generated less than one million dollars per year in gross income.  Abdi Omar, an immigrant from Somalia, is the owner and president of USA Taxi.  As of September 2006, USA Taxi had been in business for four years, dispatched approximately 30 cabs, and generated less than one million dollars a year in gross revenue.  Jasbir Rondhawa and Harjit S. Dhillon, immigrants from Pakistan, are co-owners of United Cab Company.  As of September 2006, United Cab Company had been in business for less than seven years, dispatched less than 50 cabs, and generated less than one million dollars per year in gross income.  Each of these

individuals and their cabs are licensed under Chapter 443 of the City's traffic code.

In the City, licenses for cabs and cab drivers are issued by the Commissioner of Assessments and Licenses (the "Commissioner") pursuant to the traffic code. Chapter 443 of the traffic code governs taxicabs. Among other things, Chapter 443 provides that, with a valid license, cabs may operate "upon the streets of the City." Ch. 443.02. Licenses are issued annually as of December 1 and expire the following November 30, unless sooner suspended or revoked by the Commissioner. *Id.* The Commissioner may suspend or revoke licenses granted to any company that fails to perform the duties set forth in Chapter 443.021(a). Ch. 443.022. Absent suspension or revocation, "holders of existing licenses [are] entitled without [a] finding of convenience and necessity to retain their present licenses and secure renewals thereof upon the payment of the annual license fees." Ch. 443.04(c). Chapter 443 is altogether silent about the operation of cabs at Hopkins.

Hopkins is owned and operated by the City. Chapter 571 of the Municipal Utilities and Services Code governs Hopkins. In particular, in a section entitled "Vehicles for Hire," Chapter 571 provides that "[n]o person shall operate any vehicle for hire carrying passengers, unless such operation has been approved by the Airport Management and subject to such terms and conditions as may be prescribed." Ch. 571.13. Prior to 2006, the airport's taxi service was, in essence, an open system that permitted all City-licensed cabs to line up in the outbound queue to await their turn for fares. The airport did little to

regulate—and derived no revenues from—the cabs operating at the airport.

In June of 2006, Ricky D. Smith ("Smith") was hired as the City's Director of the Department of Port Control. The responsibility for managing the City's airports, including Hopkins, lies with the Director of the Department of Port Control. Before he was hired by the City, Smith was the chief operating officer for the Maryland Aviation Administration, which owns and operates the Baltimore/Washington International Thurgood Marshall Airport ("BWI"). Under Smith's management, BWI established a closed outbound taxi system by contracting with a sole provider for exclusive outbound cab service from BWI.

In September of 2006, at Smith's behest, the City issued a Request for Proposal ("RFP") for outbound cab service from Hopkins. In short, the objective of the RFP was to provide a high level of service to patrons of the airport and the air traveling public through a clean, safe and dependable taxicab service. Among other things, the RFP provided that the award would be for an exclusive taxicab service to be operated to and from the airport only. All other taxicab services would be prohibited from picking-up fares at the airport. The RFP included a comprehensive list of minimum standards for cabs and drivers as well as a comprehensive list of minimum operating requirements. The RFP also provided that the successful bidder would be required to pay the airport a facility maintenance fee of fifty cents per outbound trip plus a per trip fee to be proposed by the bidder.

The RFP was, in part, the City's response to a large number of passenger complaints about the operation of cabs in the queue. The City, through Smith, wanted to address the complaints by establishing a new closed taxi system, a system that was better controlled by the airport, that employed a cab service—limited to 75 cabs—under contract to the airport, and that generated revenues for the airport. Among other things, the proposed exclusive service was intended to reduce what was perceived as an oversupply of cabs in the queue—an oversupply that led to immense competition over fares, rude and aggressive behavior among the cab drivers, and unhappy if not irate customers. As Smith explained:

> Under the old arrangement, again where you would have over a hundred, maybe almost 200 taxicabs in the taxi queue at a given time; if you're a taxi driver, you might get two fares in one day. And so you wait three hours for a fare. And that person, that fare, takes you to Brookpark. So you waited three hours for a fare that takes you to the other side of the airport.
>
> Our experience was that in those cases, occasionally the taxi driver would get upset with the passenger who only wanted to go to Brookpark or Fairview Park because it took them out of the line and they had to go back in the line and wait for a very long period of time.
>
> And this was associated with the number of taxicabs that were relying on the airport.

Although it reflected Smith's vision, the RFP was developed by several members of the airport staff, headed by Patricia Singleton ("Singleton"), the Chief of Business Development and Management for the Department of Port Control. When developing the

RFP, Singleton and her committee talked with consultants and surveyed the industry to get some insight into how exclusive taxi services work at other airports. Among other things, Singleton's survey work resulted in the inclusion in the RFP of minimum qualifications for bidding cab companies. The minimum qualifications included seven continuous years of experience operating a cab service, not less than 50 cabs traveling simultaneously under a dispatcher, and not less than one million dollars in gross annual revenues. The minimum qualifications were intended to ensure that any cab company using the queue would have both the experience and the financial capacity to provide dependable service. None of the plaintiffs met the minimum qualifications.

The RFP was explained by Smith at an orientation meeting to which all of the City's cab companies were invited. Of the plaintiffs, only Dhillon attended the orientation meeting. Representatives of Yellow Cab, Ace Taxi Service, and Americab were also in attendance. After the orientation meeting, Smith held a second meeting to which only minority-owned taxicab owners were invited. At this meeting, Smith wanted to give minority business owners an opportunity to respond to the RFP and to express their concerns and challenges outside the presence of majority business owners. Omar and Sisay attended the second meeting. Smith later held a third meeting with a group representing the Taxicab Association. At that meeting, Smith encouraged cab owners to enter into joint ventures and/or subcontracts to minimize the effects of the RFP on individual cab companies.

Three companies—Ace Taxi Service, Yellow Cab, and Americab—submitted proposals in response to the RFP. The three proposals were then submitted to an evaluation committee for review. None of the plaintiffs submitted proposals. After several weeks, the committee—without input from Smith—recommended to Smith that Ace Taxi Service, which is owned by a first-generation immigrant from India, be awarded the bid for outgoing cab service from the queue. Smith then went to City Council to get the necessary legislative authority to award the cab service contract to Ace Taxi Service.

In December of 2006, after hearing testimony, the City Council passed an ordinance giving Smith three options for action: (1) issue permits for cab companies to provide outbound services from Hopkins; (2) enter an agreement with a third-party concessionaire to manage outbound cab services; or (3) issue permits or enter into a concession agreement for operation of an exclusive outbound taxicab concession at Hopkins. Smith responded to the ordinance by joining with the Chief of Staff for the Mayor of Cleveland in seeking a recommendation from the Board of Control regarding the options presented by the City Council. Given its assigned task, the Board of Control established a subcommittee to evaluate the three options, to conduct an independent review of the RFP process as it affected those cab companies that had submitted proposals, and to make a recommendation to Smith. The Board of Control's task was considered a continuation and not a reopening of the RFP process.

As part of its review process, the Board of Control's subcommittee interviewed

representatives from Ace Taxi Service, Yellow Cab, and Americab, the three companies that had submitted RFP proposals. The subcommittee also interviewed a City Council representative as well as representatives of the evaluation committee. Having submitted no proposals, the plaintiffs were not asked to participate in the subcommittee's interviews.

The Board of Control ultimately recommended that the airport's queue service be awarded on a prorated basis to the three taxi companies that had submitted bids, with Ace Taxi Service to receive 35 permits, Yellow Cab to receive 25 permits, and Americab to receive 15 permits. The Board of Control's recommendation was submitted to the three bidders, who collectively agreed to the prorated arrangement.

In September of 2007, permits were issued to Ace Taxi Service, Yellow Cab, and Americab to operate 35, 25, and 15 cabs respectively. Among other things, these permits specified that the cabs were to be 2007 GPS-equipped models, painted white with airport decals on the sides of the vehicles and with roof lights saying "Airport." The permits also provided that the drivers "shall operate taxi service exclusively from the airport . . . [and] shall not be permitted to pick-up fares off-airport." The airport's cab service was thus limited to outbound fares from the queue.

The plaintiffs filed suit against Smith and the City in November of 2007, more than a year after the RFP was issued, two months after queue-service permits were issued to Ace Taxi, Yellow Cab, and Americab, and some weeks after these companies made large capital expenditures for new cabs and equipment as required by the City. The

plaintiffs alleged that the defendants (1) breached an implied contract allowing the plaintiffs to provide taxicab service at Hopkins, (2) discriminated against them on the basis of their national origin by not allowing them to provide cab service at Hopkins,[1] (3) violated their procedural due process rights by precluding them from participating in the bidding for an award of the taxicab permits, and (4) violated their right to equal protection. The plaintiffs sought a temporary restraining order, which was denied, and a preliminary injunction, which was granted. While concluding that the plaintiffs were not likely to succeed on their discrimination claim, largely because Ace Taxi Service is owned by a first-generation immigrant from India, the district court found that the plaintiffs had satisfied the prerequisites to a preliminary injunction with regard to their due process claim.[2] In particular, the district court found that (1) the plaintiffs had a property right in their taxicab licenses, the City having conferred that benefit upon them prior to 2006; (2) the defendants failed to articulate a rational basis for the RFP's minimum qualifications; and (3) the procedure used by the City for soliciting and awarding the bids did not contain many of the protections usually required before effecting the loss of a property interest. The district court accordingly issued an order

[1] The plaintiffs have not challenged on appeal the district court's decision regarding their discrimination claim.

[2] The district court did not address the plaintiffs' equal protection claim in its memorandum opinion and order granting the plaintiff's motion for preliminary injunction. In a subsequent order addressing the remedy, the district court briefly addressed the equal protection claim, concluding that the City had failed to articulate a rational relationship between the RFP and a legitimate governmental purpose.

maintaining the status quo and allowing the plaintiffs to continue to use the outbound queue at Hopkins as they had done previously.

The defendants thereafter filed a timely appeal of the district court's injunction order. This court denied the defendant's motion to stay the injunction. While stating that "the defendants have raised serious questions with respect to the merits of their appeal," the court found "no reason to alter the district court's evaluation of the balance of harms at this time." Judge Rogers dissented, stating that he would grant the stay because "of the strong likelihood that the City will prevail on the merits of the procedural due process claim."

## STANDARD OF REVIEW

This court reviews a district court's grant of a preliminary injunction under an abuse-of-discretion standard. *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.*

When considering a motion for preliminary injunction, a district court must consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). The district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*. *Id.*

## DISCUSSION

### A. Due Process Claim

The plaintiffs alleged in their complaint that they were excluded from the airport's outbound queue in violation of their procedural due process rights. To establish a procedural due process claim, the plaintiffs must establish that a state actor deprived them of a life, liberty, or property interest without appropriate process. *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). Absent a protected interest, the plaintiffs cannot claim entitlement to the protections of due process. *Id.* at 569.

The plaintiffs contend that they have a constitutionally protected property interest in "the right to accept outbound fares at Hopkins pursuant to [their cab] licenses." The Supreme Court has explained that protected property interests arise not from the Constitution but from "existing rules or understandings that stem from an independent source such as state [or local] law." *Roth*, 408 U.S. at 577. To establish a property interest in a particular benefit, the plaintiffs must demonstrate that they have a "legitimate claim of entitlement" to that benefit. *Id.* "If an official has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409-10 (6th

-11-

Cir. 2002) (quoting *Roth*, 408 U.S. at 577).  A mere "unilateral expectation" does not

constitute a property interest entitled to protection under the Due Process Clause.  *Roth*,

408 U.S. at 577.

Here, to establish a property interest in the right to use the outbound queue at

Hopkins, the plaintiffs "must point to some policy, law, or mutually explicit

understanding that both confers the benefit and limits the discretion of the City to rescind

the benefit."  *Med. Corp.*, 296 F.3d at 410.  The plaintiffs rely on the cab licenses issued

to them pursuant to Chapter 443.[3]  To be sure, the licensing of public hacks in the City is

governed by Chapter 443 of the City's traffic code.  That ordinance provides that "[n]o

public hack shall operate for hire *upon the streets of the City* without obtaining a license

from the Commissioner of Assessments and Licenses."  Ch. 443.02 (emphasis added).

Chapter 443 is altogether silent, however, about cab service at Hopkins.

A separate ordinance—Chapter 571, entitled "City Airport"—governs Hopkins.

One section of that ordinance explicitly provides that "[n]o person shall operate [at City-

owned airports] any vehicle for hire carrying passengers, unless such operation has been

approved by the Airport Management and subject to such terms and conditions as may be

prescribed."  Ch. 571.13.  According to the City, Chapter 571 gives Airport Management

unconstrained discretion over the operation of cabs at Hopkins.  It follows—the City

---

[3]  With little discussion or analysis, the district court accepted the plaintiff's assertion of a property interest, stating: "Plaintiffs . . . have established a likelihood of showing that they had a protected property interest in providing outbound taxicab service because the City of Cleveland had conferred that benefit upon them."  (A.58-59).

contends—that the plaintiffs can have no more than a unilateral expectation in the continued use of the outbound queue at the airport, and a unilateral expectation is insufficient to support their due process claim.

The City relies in large part on our decision in *Med Corp., Inc. v. City of Lima*, 296 F.3d at 404. As explained in that case, Med Corp. is a private ambulance company licensed to provide ambulance services in the City of Lima, Ohio, where emergency 911 calls from residents are dispatched to licensed ambulance companies on a rotational basis. According to Med Corp., Lima's Mayor agreed in early 1999 that the City of Lima would dispatch to Med Corp. every other 911 call received by Lima's emergency dispatch service. Lima had no written policy, procedure, or legislative enactment governing the manner in which 911 calls were allocated to private ambulance companies. In November of 1999, Lima's Mayor informed Med Corp. of his decision to suspend the dispatch of 911 calls to Med Corp. for a period of one week. The Mayor's decision was based upon alleged incidents involving Med Corp.'s slow response times and inability to locate addresses within Lima. Med Corp. immediately filed suit against Lima, seeking to enjoin Lima from carrying out its proposed suspension. Med. Corp. alleged that the suspension constituted a deprivation of property and liberty without due process of law. The district court rejected Med Corp.'s due process argument, finding that the company had no property or liberty interest in receiving 911 dispatches.

On appeal, this court affirmed, rejecting Med Corp.'s argument that its license to

operate an ambulance in the City of Lima established a property interest in receiving 911 calls. The court wrote:

> [I]n order to assert a property interest in receiving 911 calls, Med Corp. must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to rescind the benefit. Med Corp. has not made the required showing. It is undisputed that no written policy or legislative enactment establishes a procedure for maintenance of the 911 dispatch list or limits the discretion of City officials to remove ambulance companies from the list. . . .
>
> . . . Nothing in the [Municipal] Code . . . even mentions 911 calls or the allocation of 911 dispatches by the City. According to the Code, receipt of a license entitles the recipient to engage in the "business or service of the transportation of patients upon the streets, alleys or other public ways or places of the City." By its own terms, the Code guarantees only the right to do business, not the right to receive particular business opportunities from the city. . . . There is no explicit guarantee in the Code that an ambulance licensee will receive 911 dispatches from the City, so the Code cannot form the basis for a property right in the continued receipt of 911 dispatches.

*Id.* at 410-11 (citation omitted).

The plaintiffs try to distinguish *Med Corp.* by arguing that, unlike the 911 dispatch service in *Med. Corp*, the queue scheme at issue here is not wholly discretionary. In their words:

> The City has the authority to issue hack licenses under Chapter 443 of the Cleveland Municipal Code. This license grants the holder the right to operate within the city of Cleveland. Chapter 571 of the same code gives the airport management the right to approve the operation of vehicles for

-14-

hire "subject to such terms and conditions as may be prescribed." Reading the statute as a whole, Chapter 571 merely gives another city agency the authority to proscribe the terms and conditions under which a licensed cab operator may operate at Hopkins Airport. The scheme is not "wholly discretionary." (Appellees' Br. at 20)

We are unpersuaded by the plaintiffs' argument. The plain language of Chapter 571 confers broad authority upon Airport Management[4] to control vehicles for hire at the airport. Indeed, in no uncertain terms, the ordinance provides that "[n]o person shall operate any vehicle for hire carrying passengers, *unless such operation has been approved by the Airport Management and subject to such terms and conditions as may be prescribed.*" Ch. 571.13 (emphasis added). The ordinance otherwise places no limits on Airport Management's authority to either approve or restrict the operation of "any vehicle for hire carrying passengers" at the airport or to decide what terms and conditions may be imposed upon cabs at the airport. Thus, under Chapter 571, Airport Management has the unfettered discretion to decide how and by whom the outbound queue may be used at any particular time.

That Chapter 443 provides generally for the licensing of public hacks for hire "upon the streets of the City" does not mean that Chapter 571 can be construed to mean something other than what it says. It is a well-established canon of statutory construction that, if the text of a law or ordinance is unambiguous, courts must give effect to the plain

---

[4] Chapter 571 defines "Airport Management" to mean the Director of Port Control or his authorized representative. Randy Smith was the Director of Port Control at all times relevant to this lawsuit.

meaning of that law or ordinance. *See, e.g.*, *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (noting that the Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there"); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (explaining that, where a statute's language is plain, the sole function of the courts is to apply the statute's ordinary and plain meaning). Moreover, absent a clear intention to the contrary, a specific law will not be controlled or nullified by a general law. *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974); *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) (noting that, "[a]s a matter of statutory construction, a specific statutory provision governs a general one"). Here, Chapter 571.13 is a specific ordinance that, in plain terms, gives Airport Management unlimited discretion to control the operation of cabs at Hopkins, whether in the outbound queue or elsewhere. We find nothing in the Municipal Code to suggest that the discretion unambiguously conferred by Chapter 571.13 is nullified by the more general licensing provisions contained in Chapter 443.

Because Airport Management's control over the operation of cabs at the airport is wholly discretionary, the plaintiffs cannot establish that they have a "legitimate claim of entitlement" to use the airport's outbound queue. At most, they have a "unilateral expectation" based, in part, on the City's having impliedly consented to the plaintiffs' use of the queue in the past. Past use, however, cannot form the basis of a property interest

absent a legitimate claim of entitlement arising from statute, regulation, contract, or other independent source. As the Supreme Court stated in *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458 (1981): "A constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past." *Id.* at 465 (internal quotation marks and citation omitted); *see also Med Corp.*, 296 F.3d at 411 (finding no property interest in ambulance company's receiving 911 calls, despite past receipt of such calls, where there was no municipal code or official policy granting that interest); *Blackburn v. City of Marshall*, 42 F.3d 925, 940 (5th Cir. 1995) (affirming dismissal of the plaintiff's due process claim where the plaintiff—as owner of a towing and wrecker service business—failed to allege that his interest in remaining on the city's rotational wrecker-referral list stemmed from "a state statute or regulatory scheme, a contract, or any other independent source").

Citing *Med Corp.*, the plaintiffs contend that the City's newly-adopted queue scheme has destroyed the value of their cab licenses and that this "indirect injury" to their licenses supports their due process claim.[5] To be sure, in *Med Corp.*, 296 F.3d at 413, this court noted that indirect injuries to the value of property may, in some circumstances, constitute constitutional deprivations. The *Med Corp.* court also noted, however, that indirect injuries have been recognized as constitutional deprivations only "when such indirect injuries *effectively render the property valueless*." *Id.* (emphasis in original)

_____

[5] There is no allegation that the plaintiffs' cab licenses have been or will be suspended or revoked.

(internal quotation marks and citation omitted).  It was not decided in *Med Corp.* that a

*due process claim* may be based upon the indirect loss in the value of a license.  Instead,

in dicta, the court assumed that, *if* Med Corp. could assert a due process claim based upon

the indirect loss in the value of its ambulance license, summary judgment for the

defendant would nonetheless be appropriate because Med Corp. failed to show that the

loss of 911 dispatches would render its ambulance license valueless, even during the time

its dispatch privileges were suspended.

　　Ordinarily, due process protections are not accorded to persons who are indirectly

affected by government action.   Indeed, long ago, in *Legal Tender Cases*, 12 Wall. 457,

20 L. Ed. 287 (1870), the Supreme Court wrote:

> [The Due Process Clause] has always been understood as
> referring only to a direct appropriation, and not to
> consequential injuries resulting from the exercise of lawful
> power.  It has never been supposed to have any bearing upon,
> or to inhibit laws that indirectly work harm and loss to
> individuals.

*Id.* at 551.  In 1980, citing *Legal Tender Cases*, the Supreme Court reiterated the principle

that "due process . . . does not apply to the indirect adverse effects of governmental

action." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 789 (1980) (holding

that nursing home residents who asserted a property interest in continued residence at

their nursing home had no right to due process before state and federal agencies

decertified the home for Medicare and Medicaid purposes, thus threatening the asserted

property interests of the residents).[6] More recently, citing *O'Bannon*, this court found no due process claim where the plaintiff alleged that the government's change in a regulatory policy resulted in an indirect injury to the plaintiff's license to do business. *Nuclear Transport & Storage, Inc. v. United States*, 890 F.2d 1348, 1354 (6th Cir. 1989).

The plaintiff in *Nuclear Transport* operated a storage facility for unenriched nuclear feed material owned by utilities and other private entities. The material was kept in storage until it was enriched by the Department of Energy for use as fuel in nuclear power generators. The plaintiff developed its storage facilities and acquired the requisite license for storing unenriched uranium based, at least in part, on the government's assurances that it (the government) would not itself provide storage services to its enrichment customers. When the government later changed its policy and began providing storage services for unenriched nuclear feed material, the plaintiff's business allegedly declined by approximately 75%. The plaintiff sued, alleging that the government adversely affected the value of its license without due process of law. The

---

[6] The *O'Bannon* Court acknowledged that the principle was not absolute, stating in a footnote:

> We of course need not and do not hold that a person may never have a right to a hearing before his interests may be indirectly affected by government action. Conceivably, for example, if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing.

*O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 789 n.22 (1980).

district court dismissed the plaintiff's due process claim based on the plaintiff's failure to assert a constitutionally protected property interest. This court affirmed, stating: "Even if the government has changed its regulatory policy to plaintiff's commercial detriment, plaintiff has alleged no more than an [indirect] injury resulting from government action which does not create entitlement to a hearing." *Id.* The court further explained that, because there was nothing in the relevant statute, regulations, or government policy that provided the plaintiff with a constitutionally protected right to provide storage services under its license free of government competition, the plaintiff's license "provided it at most with a mere unilateral expectation that the government would not provide storage space, which is not a property interest entitled to protection." *Id.* (internal quotation marks and citation omitted); *see also BPNC, Inc. v. Taft*, 147 Fed. Appx. 525, 531 (6th Cir. 2005) (holding that lost sales resulting from the state defendants' alleged defamatory statements constituted an indirect injury from governmental action that was not actionable under the Fourteenth Amendment").

Consistent with *Nuclear Transport*, we find that the loss in business suffered by the plaintiffs in this case was an indirect injury that did not create entitlement to due process. In restricting use of the airport's outbound queue, the City was acting squarely within the discretion granted it under Chapter 571.13. Moreover, nothing in the City's ordinances suggests that the plaintiffs' cab licenses conferred a constitutionally protected right to provide cab service at the airport free of restraint by Airport Management or free

of any changes by Airport Management in the terms and/or conditions affecting cab service at the airport. When they were originally granted their licenses, and when they renewed those licenses each year thereafter, the plaintiffs had no more than a unilateral expectation that they would be permitted to use the outbound queue at the airport. That unilateral expectation did not constitute a property interest entitled to due process protection.[7] Absent evidence of a constitutionally-protected property interest, the plaintiffs cannot establish likelihood of success on the merits of their due process claim.

## B. Equal Protection Claim

Without elaboration, the plaintiffs alleged in their complaint that the City violated their rights to equal protection. In their motion for temporary restraining order and preliminary injunction, the plaintiffs asserted that the City's newly-adopted queue scheme was "being done for discriminatory reasons and in breach of Plaintiffs' contract with the City of Cleveland and their due process rights guaranteed under the United States and Ohio Constitutions." (J.A. 29) They made no mention of an equal protection violation.

After an evidentiary hearing, the district court granted the plaintiffs' motion for preliminary injunction without addressing the cursory equal protection claim alleged in the plaintiffs' complaint. The district court instead addressed the plaintiffs' race

---

[7] The City's queue restriction affected only the plaintiffs' right to use the outbound queue at the airport. This queue restriction did not affect the plaintiffs' right to carry passengers *to* the airport, or the right to respond to calls from passengers wanting transportation *from* the airport, or the right to carry passengers anywhere *within* the City's streets. While the record establishes that the plaintiffs suffered a loss of business, it does not establish that the plaintiffs' licenses were rendered valueless.

discrimination and due process claims, finding that, while the evidence did not support a claim of race discrimination, the plaintiffs had sustained their burden under the Due Process Clause for issuance of a preliminary injunction.[8]  In its ensuing remedy order, the district court stated that the plaintiffs "allege[d] that the minimum qualifications in the Request for Proposal ("RFP") violate[d] the Equal Protection Clause of the Fourteenth Amendment because they arbitrarily discriminate[d] against the owners of the smaller taxicab companies."  (J.A. 48).  The district court went on to suggest that, because the City failed to articulate a rational relationship between the RFP's minimum qualification requirements and a legitimate governmental purpose, the plaintiffs satisfied their burden "to justify the imposition of injunctive relief."  The City maintains that the district court erred by placing the burden on the City to sustain the rationality of the RFP's minimum qualifications.

In Club Italia Soccer & Sports Organization, Inc. v. Charter Township of Shelby, Michigan, 470 F.3d 286 (6th Cir. 2006), this court explained what it takes to establish a claim under the Equal Protection Clause as follows:

> To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.

_____

[8]  The plaintiffs' did not allege in their complaint or in their motion for preliminary injunction *any* specifics about how their equal protection rights were violated, which may explain the district court's failure to address the issue.

When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis. Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational. A plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.

Under rational basis review, the defendant has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data. The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law.

*Id.* at 298 (internal quotation marks and citations omitted).

Here, having determined that the plaintiffs' equal protection claim targeted the City's purported disparate treatment of "smaller taxicab companies" rather than a suspect class, the district court recognized that rational basis scrutiny was required. It appears, however, that the district court failed to recognize that the City was entitled to a *presumption* of rationality. To overcome that presumption, the plaintiffs were required to prove that the City's RFP requirements lacked *any* rational basis. This they failed to do.

Although it had no burden to do so, the City—through the testimony of Ricky Smith, Director of Hopkins, and Pat Singleton, Chief of Business Development and

Management for the Department of Port Control—explained the basis for its RFP's minimum qualification requirements. Singleton explained that the qualifications were based in large part on RFP's issued by other airports for similar service. Smith stated that, prior to adopting the new taxi scheme, the airport had received a number of complaints from passengers about the taxi service at the airport. Many of the problems then experienced by the airport were the result of too many taxicabs lining up outside the airport. Smith wanted to reduce the number of cabs in the taxi queue at any given time from the then-current numbers of 100-200 cabs down to 75 cabs, and he wanted an exclusive, fee-generating arrangement with one cab company so that the airport would receive revenue from, and have more control over, the cabs using the queue. In Smith's words:

> [T]he goal there was to—the taxi service is a crucial service to the airport. In essence we're asking our contractor to be responsible for transporting our passengers from one point to another point safely, and to provide that service in a way that is reliable and dependable.
>
> And so it was incumbent upon us to make sure that that service provider had demonstrated experience at doing that, had the financial capacity to make sure that that continued to happen, and so the minimum requirements simply reflect those conditions.

(A.233) The plaintiffs not only failed to negate every conceivable basis which might support the City's action, but they also failed to negate the evidence presented by the City. The plaintiffs thus failed to establish that they were likely to succeed on the merits of their equal protection claim.

## CONCLUSION

Because the plaintiffs failed to establish that they were likely to succeed on the merits of both their due process and their equal protection claims, they were not entitled to a preliminary injunction. We accordingly **REVERSE** the district court's order granting such an injunction.

**CLAY, Circuit Judge, dissenting.** This case involves a number of contested factual issues and competing interests that should ultimately be resolved at trial. After hearing the testimony of multiple witnesses, applying the preliminary injunction standard to the case, and weighing the parties' interests, the district court concluded that a preliminary injunction was appropriate to maintain the status quo until a trial can be held. Because I agree that the plaintiff taxicab owners present a likelihood of success on the merits of their procedural due process claim, and because, under a balancing of the equities, I share the district court's concern that the source of Plaintiffs' livelihood is at stake, I believe this Court should affirm the district court's grant of a preliminary injunction.

I.

A number of material facts are disputed in this case, so some background is in order. Prior to 2007, taxis were allowed to pick up fares at Cleveland Hopkins International Airport ("Hopkins") on a first-come first-served basis, and taxis from seven taxicab companies operating in the Cleveland area waited in a taxi queue for fares. In September 2006, the Cleveland Department of Port Control, led by director Ricky Smith, issued a Request for Proposals ("RFP"), soliciting applications and bids for an exclusive contract to pick up passengers from the airport. The RFP required that an applying taxicab company demonstrate a minimum of seven years of continuous service, fifty or more cabs and one million dollars of annual gross revenue.

To introduce the RFP, representatives of the Department of Port Control invited all area taxicab companies to an orientation meeting at Hopkins. Director Ricky Smith also held a separate meeting for minority business owners. Following the distribution of the RFP, Hopkins received proposals from the three largest taxicab companies in the Cleveland area: Ace, Americab, and Yellow Cab, the only companies that were able to satisfy the criteria set forth in the RFP. The proposals were reviewed by an evaluation committee and the committee recommended that Ace Taxi Service be granted an exclusive contract.

Smith sought approval of the contract award from the Cleveland City Council ("City Council"), but Yellow Cab was dissatisfied with the committee's decision and lobbied City Council. On December 4, 2006, City Council held a hearing where various taxi companies, including Plaintiffs' companies, testified regarding the effect an exclusive contract would have on their business. After hearing this testimony, City Council passed Ordinance 1781-A-06 which gave the Department of Port Control the option to retain the current open system of taxi service, award the contract to Ace Taxi Service, or award the contract to a limited number of companies.

The Department of Port Control subsequently awarded Ace, Americab, and Yellow Cab prorated shares of the taxi service. Smith met with representatives of Plaintiffs' companies – the same minority-owned businesses who were invited to the initial RFP meeting with Smith – to inform them of this decision. Smith sent a letter to

Plaintiffs' counsel informing Plaintiffs that Hopkins would go forward with the exclusive outbound service plan, and on October 9, 2007, Plaintiffs were informed by telephone that they would not be able to send taxis to the airport the next day because the plan was going into effect.

Plaintiffs filed suit against the City of Cleveland ("the City") and Ricky D. Smith two days later, alleging breach of contract, discrimination based on national origin, procedural due process violations, and violations of their substantive due process and equal protection rights. They sought compensatory and consequential damages and a preliminary and permanent injunction.

The district court conducted a preliminary injunction hearing on November 13, 2007 and heard testimony from several witnesses. Plaintiffs – ethnic minorities from Somalia, Ethiopia, India, and Pakistan – testified that they had been harassed by airport police and the taxi queue starters, who systematically ticketed minority drivers while using racial epithets and anti-immigrant slurs, and that their complaints to the police and airport authorities had been ignored. They also testified that separate meetings had been held for minority cab owners, and that they felt that the qualifying criteria set forth in the RFP had been written in such a way as to discriminate against them.

Richard Herman, a lawyer who assisted taxicab owners in earlier interactions with the City, testified that a number of drivers contacted him to express concerns that airport police discriminated against minority drivers and repeatedly used racial epithets and anti-

immigrant slurs. He testified that his group began to write letters to the mayor and the director of community relations to raise issues of "ethnic strife," and that the national origin and race of his clients permeated the relationship they had with the city. He testified that he helped the drivers put together a "Call to Action" to voice their concerns in February 2006, prior to the issuance of the RFP. Defendants attempted to limit testimony regarding incidents at the airport, but Plaintiffs argued that discrimination is a hidden activity.

In addition, Plaintiffs Kashmir Sing, Abdi Omar, Desalegn Sisay, and Harjit Dhillon also presented evidence that the outbound airport service constituted 85 to 90% of their business and that the new system would put them out of business within a week to ten days, if not immediately.

Defendant Ricky Smith testified that the RFP was issued for legitimate business reasons. He stated that the exclusive contract plan would create a source of revenue because the airport would be able to charge the taxicab service $3 per trip. He also stated that the new system would decrease competition and enable stricter regulation, which would address complaints about competitive taxi drivers attempting to intimidate customers. He testified that the complaints he heard were not associated with any particular racial or ethnic group, and that he believed the underlying tensions stemmed from issues of supply and demand.

Smith testified that he held a separate meeting for minority business owners to

"reach out to them" and to help them understand what they could do to take advantage of the new program. He stated that he felt a separate meeting was necessary because "minority owned business do not feel comfortable sharing some of the concerns and challenges that they have in the presence of majority business owners out of fear they may be black-balled or cast aside." (Joint Appendix ("J.A.") at 239.)

On November 20, 2007, the district court granted a preliminary injunction, holding that Plaintiffs had sustained their burden of demonstrating a strong likelihood of success on their due process claim. Defendants appealed and the matter is now before this Court.

II.

This Court reviews a district court's order granting a preliminary injunction for abuse of discretion. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). In so doing, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *Id.* at 541.

A district court must consider four factors in deciding whether to issue a preliminary injunction: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001)). We have advised that these four factors are "factors

to be balanced, not prerequisites that must be met," and that "the district court's weighing and balancing of the equities is overruled only in the rarest of cases." *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997).

Although the district court's decision that a litigant is likely to succeed on the merits is a legal question that is reviewed *de novo*, "the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion." *Certified Restoration Dry Cleaning Network,* 511 F.3d at 541. "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* (citations omitted).

## A.

To demonstrate a likelihood of success on the merits of a procedural due process claim, Plaintiffs must establish three elements: "(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment . . . , (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (quoting *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). Plaintiffs are likely to succeed on each of these elements.

i.

First, Plaintiffs are likely to establish that they have a property interest that is constitutionally protected.

Property interests "may take many forms." *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). One of these forms is a license, so long as the license can be suspended only upon specified conditions. *See, e.g., Mackey v. Montrym*, 443 U.S. 1, 12-13 (1979) (holding that it was clear that the Due Process Clause applies to a state's suspension or revocation of a driver's license); *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (holding that a horse trainer's license was constitutionally protected because the state had engendered an expectation of continued enjoyment in it absent culpable conduct); *Wojcik v. City of Romulus*, 257 F.3d 600, 610 (6th Cir. 2001) (explaining that a holder of a liquor license has a constitutionally protected interest, particularly when expenditures have been made in reliance on it).

In this case, Plaintiffs rely on their taxicab licenses to operate their businesses and have a well-founded expectation that the licenses will not be revoked absent culpable conduct. Chapter 443 of the Cleveland Code of Ordinances, which governs the operation of taxicab services, provides that licenses can be revoked or suspended "if the vehicle is used for immoral or illegal purposes, or if the vehicle is not in good condition, clean or safe," C.C.O. § 443.12, or "upon conviction for any violation of this chapter [Chapter 443, Taxicabs]." C.C.O. § 443.36. Importantly, the ordinances specify that "before

suspending or revoking [a] license, the Commissioner shall afford the licensee the opportunity of a hearing upon the charges." C.C.O. § 443.21. Like in *Barry*, the City has set forth the conditions under which the license can be suspended and has "engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct." 443 U.S. at 64.

Courts have held that property interests in licenses are particularly strong where, as in this case, plaintiffs depend on the licenses for their livelihood. In *Bell v. Burson*, the Supreme Court explained that "a clergyman whose ministry require[d] him to travel by car" had a protected property interest in his driver's license, because"[o]nce licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." 402 U.S. 535, 539 (1971). Revocation of a taxicab license impacts Plaintiffs' livelihood even more directly than does the revocation of a driver's license, and Plaintiffs' property interests in their licenses must not be transgressed for invidious or improper reasons.

Defendants claim, and the majority opinion agrees, that even if Plaintiffs' interest in their *licenses* are protected, they have no protected interest in particular business opportunities at the Hopkins Airport. This formulation misstates the issue. In *Med Corp.*, this Court acknowledged, concurrent with our sister circuits, that while a city can

certainly impose conditions that *decrease* a company's business opportunities, a city

cannot impose conditions that render a license valueless without providing procedural

protections. 296 F.3d at 412.[9] The reasoning behind this proposition is sound: if a city or

state could *de facto* suspend the license without satisfying the requirements of the due

process clause, the protections provided to such interests would be substantially

diminished. The impact of such a rule would be particularly unjust in cases, like the

instant case, where there is a factual dispute as to whether the defendant's actions are

motivated by discriminatory intent.[10]

In line with this reasoning, the *Med Corp.* Court discussed *Reed*, a case where

proprietors of a music venue that served alcohol claimed that village officials deprived

them of their property rights in their liquor license by engaging in a pattern of official

harassment. The alleged harassment included "arresting customers and employees on

baseless charges, demanding proof of age from customers who obviously were many

---

[9]The *Med Corp.* Court cited *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (holding that a state official's action in disseminating damaging information about the plaintiff that prevented him from obtaining employment constituted effective revocation of plaintiff's certification to work as a peace officer); *Westborough Mall, Inc. v. City of Cape Girardeau*, 794 F.2d 330, 336 (8th Cir. 1986) (holding that the operation of an automatic reverter provision forced appellants to give up construction of a shopping center and therefore deprived them of their property rights, "even though the zoning classification was never actually reverted or revoked"); and *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) (discussed *infra*).

[10]While Plaintiffs' procedural due process and discrimination claims must be analyzed separately, the facts of this case create some inherent overlap in the claims. Plaintiffs allege that the City's actions were motivated by discriminatory intent, and they presented evidence to support their position. Considering these allegations and the fact that the licenses are the source of Plaintiffs' livelihood, the need for procedural protections is particularly compelling.

years over the legal drinking age, and bringing groundless proceedings," and ultimately forced the plaintiffs to close their establishment and surrender their liquor license. *Med Corp.*, 296 F.3d at 412 (quoting *Reed*, 704 F.2d at 947). In *Reed*, the court concluded that, although "the defendants never succeeded in taking away the plaintiffs' license either by revocation or nonrenewal," village officials still "deprived" the plaintiffs of their property interests in the liquor license under the due process clause. 704 F.2d at 949.

In the instant case, like in *Reed*, the record is replete with evidence that the City's proposed actions would render Plaintiffs' licenses valueless.[11] Moreover, like in *Reed*, if Plaintiffs' version of events is believed, it would be particularly unjust to allow a city to target particular individuals based on minority ethnicity, small business status, or other such reasons by creating an end-run around the due process clause.

Despite evidence of the detrimental effects of the new policy on Plaintiffs, Defendants maintain that the policy does not entirely deprive Plaintiffs of the benefit of their licenses, and argue that there are ample opportunities for Plaintiffs to provide services from downtown Cleveland to the airport. This is a matter of degree and is a factual issue for the district court to consider. Plaintiffs offered testimony that inbound airport drop-offs are insufficient to sustain their companies and that Hopkins' new policy

---

[11]At the preliminary injunction hearing, Plaintiff Kashmir Sing testified regarding the effect of the new policy on his company, Airport Taxi. Before the new policy, outbound service from Hopkins made up 85% of Airport Taxi's business, and Sing employed 32 drivers. By the time of the preliminary injunction hearing, Sing had only four drivers and expected to go out of business in a week to ten days if the preliminary injunction was not granted. Plaintiffs Abdi Omar, Desalegn Sisay, and Harjit Dhillon offered comparable testimony.

would put them out of business notwithstanding those opportunities. The district court had wide discretion to credit that testimony, and there is no basis for this Court to find that factual finding to be clearly erroneous. In sum, because Plaintiffs can demonstrate that they have a protected interest in their licenses and that the City's proposed policy would destroy the value of their licenses, Plaintiffs have a substantial likelihood of proving that they were deprived of a constitutionally protected property interest.

ii.

Plaintiffs must also demonstrate that "the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Hahn v. Star Bank*, 190 F.3d at 716. It is "fundamental" that the notice and the opportunity to be heard be granted "at a meaningful time and in a meaningful manner." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (internal citations and quotation marks omitted). In reviewing state action in this area, we look to substance, not to bare form to determine whether constitutional requirements have been honored. *Bell v. Burson*, 402 U.S. 535, 542-43 (1971). A hearing "which excludes consideration of an element essential to the decision [of] whether licenses . . . shall be suspended" is not meaningful. *Id*. at 542.

The district court properly concluded that the procedures established by

Defendants were inadequate.[12]  First, Defendants issued a RFP that contained conditions – including requirements that the companies have seven years experience, 50 cabs, and one million dollars in gross revenue per year – which by their very terms excluded Plaintiffs from the bidding process.  The record contains evidence that Defendant Smith was aware of this impact on Plaintiffs and that he set up separate meetings to inform prospective winners and losers of the new minimum qualifications.[13]  The district court properly observed that "[a]lthough the Court does not take issue with Defendants' desire to ensure that the taxicab companies providing service at Hopkins are financially sound and reputable, the fact that the lines drawn excluded every cab company which was also excluded form the initial meeting with Smith is salient."  (J.A. at 42.)

The City argues that Plaintiffs had an opportunity to voice their concerns at a City Council meeting, and that the procurement process was further reviewed by the Board of Control as a continuation of the RFP process.  However, the record contains evidence that none of these meetings or procedures considered reopening or modifying the bidding process in a way that would allow Plaintiffs to apply; the purpose of these procedural

---

[12]Having found that Plaintiffs do not possess a protected property interest, the majority opinion does not address the adequacy of the procedural rights that were afforded to Plaintiffs.

[13]Plaintiffs testified that Smith met with the prevailing cab companies – Yellow Cab, Ace, and Americab – at 9:00 a.m. on September 11, 2006 without Plaintiff cab companies present to discuss the RFP.  He then met with Plaintiff cab companies separately at 11:00 a.m. that day.  As discussed above, Defendant Smith acknowledged in the preliminary injunction hearing that he purposefully set up a separate meeting for the minority-owned cab companies because "minority owned business do not feel comfortable sharing some of the concerns and challenges that they have in the presence of majority business."  (J.A. at 239.)

steps was to look at the proposals of the *existing* bidders.[14]  These steps did not change the fact that Plaintiffs were excluded as candidates from the moment the RFP was issued.

Considering the substance and not the bare form of what has transpired, *see Bell*, 402 U.S. at 542-43, and considering that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner," *see Hamdi*, 542 U.S. at 533, it is obvious that Plaintiffs were not provided a *meaningful* opportunity to be heard.  Consequently, Plaintiffs demonstrate a likelihood of success on the merits of their due process claim.

B.

In deciding whether to issue a preliminary injunction, courts must also consider whether a plaintiff will suffer "irreparable harm" absent the injunction.  *Tucker*, 398 F.3d at 461.  As discussed above, several Plaintiffs presented evidence that they would go out of business almost immediately absent the injunction.  This type of financial impact constitutes "irreparable harm."  *See Warren v. City of Athens*, 411 F.3d 697, 711-712 (6th Cir. 2005) (plaintiff showed irreparable harm by showing they would "likely go out of business"); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) ("financial ruin qualifies as irreparable harm"); *Basicomputer Corp. v.*

---

[14]At the Preliminary Injunction hearing, Defendant Smith testified that the subcommittee of the Board of Control was directed to look at the existing bidders.  He explicitly stated that "it was not the scope of the . . . Board of Control to expand the procurement process or to reopen the procurement process.  It was simply to review the ongoing procurement process."  (J.A. at 245.)

*Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) (competitive losses constitute irreparable harm). This factor also supports the issuance of an injunction.

C.

Finally, we must consider whether granting the injunction will cause substantial harm to others, and the impact of an injunction upon the public interest. *Tucker*, 398 F.3d at 461. Defendants claim that the preliminary injunction would cause substantial harm to the cab companies that were awarded exclusive contracts – Ace, Yellow Cab and Americab – because, at the time the district court issued its preliminary injunction order, the companies had already purchased new taxicabs that are unsuitable for general use.[15] If the companies did not have exclusive contracts with the airport and the volume increases they had expected, Defendants argue that those companies would face a substantial loss in their investment.

The district court found that any harm to these companies could be averted because Plaintiffs agreed to purchase these new vehicles if the injunction were imposed. While the record is unclear as to how the district court would implement such an agreement, this fact alone does not obviate the need for an injunction. Further, it is unlikely that the injunction would cause substantial injury to the public. There appear to be sufficient cabs available to service airport customers with or without the injunction, and the injunction

---

[15]Defendants claim that the newly-purchased taxicabs are not suited for general use because they are marked as airport taxis and are not equipped with meters due to the grid system of payment imposed by the airport.

would merely maintain the system that has been in place for years at the airport. Given the competing interests in the case, the district court could reasonably conclude that maintaining that system until trial would be the least disruptive and most equitable course of events.

In sum, the aforementioned factors – the likelihood of success on the merits, the potential harm to the plaintiffs and others, and impact of the injunction on the public interest – are "factors to be balanced, not prerequisites that must be met." *Six Clinics Holding Corp., II,* 119 F.3d at 400. Balancing these factors, and providing strong deference to district court's weighing and balancing of the equities, the district court's grant of an injunction with respect to Plaintiffs' due process claim should be affirmed.

### III.

While the majority and district court opinions focus on Plaintiffs' due process claim, Plaintiffs also have raised a potentially viable discrimination claim under 42 U.S.C. §1981.

In their complaint, Plaintiffs allege that Defendants discriminated against the Plaintiffs based upon their national origin in violation of 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of contractual relationships. The district court concluded that Plaintiffs did not establish a prima facie case of discrimination because it found that, under *Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987), national origin is not a protected class under § 1981. A close reading of

*Saint Francis College* decision points us in the opposite direction. In that case, the Supreme Court stated "we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics . . . whether or not it would be classified as racial in terms of modern scientific theory." *Id.* at 613. This Court has since acknowledged *Saint Francis College* as a case that stands for a "broad" or "expansive" view of racial discrimination under § 1981, and applied it to conclude that a claim of discrimination based on "ancestry or ethnic characteristics" was cognizable under § 1981. *Amini v. Oberlin College*, 259 F.3d 493, 502-503 (6th Cir. 2001).

Although Plaintiffs do state, in asserting the § 1981 claim in their complaint, that they were discriminated against because they are "first generation immigrants," this terminology seems to refer to the fact that Plaintiffs come from a variety of ethnic groups – Somalian, Pakistani, Indian, and Ethiopian. Section 1981 does not require that plaintiffs be from a *single* minority ethnic group or that they use a prescribed term each time they discuss discrimination. Moreover, any imprecision is later cured because the complaint goes on to say that Plaintiffs have suffered discrimination based on "national origin and/or ancestry." Applying *Saint Francis College*, 481 U.S. at 613, and looking at the substance of Plaintiffs' claims, it is clear that Plaintiffs state a cognizable claim of

discrimination based on national origin under § 1981.[16]

As discussed above, Plaintiffs presented evidence of harassment by airport police and personnel, including the use of racially derogatory language. Likewise, they presented evidence that they had raised concerns regarding "ethnic strife" months prior to the issuance of the RFP. This could all support a belief the RFP was written with the intent to exclude minority cab owners and drivers. Regardless of whether Plaintiffs ultimately prevail on their discrimination claim, evidence regarding this claim should not be disregarded based on a conclusion that Plaintiffs failed to allege "race" discrimination. Therefore, while I would respect the district court's decision not to grant a preliminary injunction on the basis of that claim, I believe the district court should give further consideration to Plaintiffs' § 1981 claim.

IV.

In sum, I conclude that Plaintiffs have established a likelihood of success on their due process claim and a potentially viable discrimination claim. Given the interests at stake, a district court could properly conclude that the preliminary injunction factors support the issuance of an injunction. Remembering that a district court's weighing and balancing of the equities should be overruled only in the "rarest of cases," *Six Clinics*

---

[16]The district court also seems to have been persuaded by an alternative argument that even if Plaintiffs had stated a proper claim of race-based discrimination, the evidence did not support such a claim because Ace – one of the three cab companies awarded a contract – is owned by a member of a protected class (a first-generation immigrant from India). This observation alone does not defeat Plaintiffs' claim, and the claim warrants further consideration.

*Holding Corp., II*, 119 F.3d at 400, this Court should affirm the court's order and

continue the injunction until this matter is resolved at trial.  Therefore, I respectfully

dissent.